# THE PEOPLE against COOK.

8   67
129   468
8   67
152   92
8   67
155   502
8        67
e 75 AD³114

An action in the nature of a writ of *quo warranto* is a civil action, and the decisions of the supreme court in it are to be reviewed upon the principles applicable to such actions, and not by those which prevail in criminal proceedings.

Where the pleadings raise a question of fraud in relation to the acts of a board of public officers, and the evidence on trial goes only to show an irregularity without fraudulent intent, the court is not bound to submit it to the jury as an open question.

When it appeared that in an election where *Benjamin Welch junior*, was a candidate, ballots were given for *Benjamin C. Welch junior*, and *Benjamin Welch*, and evidence was given sufficient to establish *prima facie* that they were given for *Benjamin Welch junior*, and none was given to the contrary, it was held that no question of fact was raised which should have been left to the jury.

Where a *prima facie* case is made out by the plaintiff, and there is a failure of proof on the part of the defendant to defeat it, it is proper for the court to direct a verdict for the plaintiff. To render the direction erroneous, it must be shown that a controverted question of fact was decided by the judge.

Where it becomes necessary to review the question whether a fact assumed by a justice at the circuit in the disposition of a case was warranted by the evidence, the nonexistence of the fact should be made a point in the supreme court, either in a case containing the evidence, or in a bill of exceptions.

Fraud in judicial proceedings can never be predicated of a mere emotion of the mind, disconnected with an act occasioning an injury. When imputed to the acts of inspectors of election, it implies an illegal and wrongful act purposely committed.

It is competent for a court, in an action in the nature of a *quo warranto*, to receive extrinsic testimony that ballots cast for *Benjamin C. Welch junior*, and *Benjamin Welch*, were intended for *Benjamin Welch junior*.

The board of state canvassers act in the main ministerially in making their certificate. They can not be charged with error in refusing to add to the votes given for *Benjamin Welch junior*, those given for *Benjamin C. Welch junior* and for *Benjamin Welch*. Their judicial power extends no further than to take notice of matters of general notoriety, as that certain abbreviations are used for particular names. They can not hear evidence beyond the return to show the intention of the voters.

The supreme court has power to go behind the certificate of the canvassers and

the ballot box, to ascertain the intention of voters in depositing their ballots, and to correct errors made by them.

The certificate of the board of canvassers may be conclusive of the election of an officer in a controversy arising collaterally, or between the party holding it and a stranger. But between the people and the party in an action to impeach it, it is only *prima facie* evidence of the right. It is the will of the electors, and not the certificate, which gives the right to the office.

The neglect of the inspectors or clerks of an election to take the prescribed oath, does not vitiate an election: neither does the irregular administration of the oath.

An oath irregularly administered, *e. g.*, upon a book other than the holy evangelists, the parties administering and taking it supposing it a bible, is a valid oath.

Ballots for a state officer containing, in addition to the names of the candidates for state offices, a vote for county judge, should be counted for the state officer.

Where it appeared upon the trial that a return of an election district regular upon its face, signed by three persons as inspectors of elections, who in fact had acted as such upon mistaken information, had been rejected by the county canvassers, and a certificate of the town clerk was offered in evidence to show that the persons acting were not the inspectors; *held* that the county canvassers should have admitted the return, and that the evidence to show the persons acting were not the inspectors, was incompetent.

Where the votes given in an election district have been canvassed by the county and state canvassers, and the defendant seeks to reject them as irregular, he holds the affirmative, and must show that the votes were untruly canvassed, or that some facts exist which show that the certificate does not truly state the result of the popular will. It is not enough that he shows that the board was not regularly constituted, that the poll lists were not compared, or that other irregularities intervened, if no illegal votes were received, no legal votes were rejected, or that the votes were not faithfully canvassed.

The rules for conducting an election contained in the statutes, are intended to afford all citizens an opportunity to exercise their right to vote, to prevent illegal votes, and to ascertain with certainty the true number of votes cast, and for whom. These are directory, and not jurisdictional in their character.

In the absence of the inspectors of election at the time for opening the poll, the persons who may be appointed by the supervisor, town clerk and justices, are appointed to supply the vacancies of the absent inspectors for that election. They are not appointed to act until others are appointed.

If the temporary appointment is made by the supervisor, town clerk, and less than two justices, it is irregular, and does not displace the regular inspectors; but it is a colorable authority for the persons appointed, and renders them, while exercising their functions, officers *de facto*.

The People *against* Cook.

If the inspectors can not find persons who will accept the office of clerks of the poll, the election is not to fail, but the inspectors ·should perform the duty of clerks.

The occasional interference during an election of more than three inspectors, if all were inspectors *de facto*, does not prejudice the return.

A challenged voter, swearing falsely before a *de facto* board of inspectors, is liable to the same punishment as if the oath had been administered by inspectors *de jure*.

The failure of inspectors of election to comply with the provisions of the statute, is not analagous to an error committed in receiving or rejecting evidence on a trial. It has no necessary tendency to injure one candidate more than another.

The closing of the outer door of the room where an election is held, at sundown, and then permitting the voters within the room to vote, will not render the election invalid, unless it be shown either that legal voters were excluded by the closing of the door, or that illegal votes were received after sundown. The provision of the statute as to the time of opening and closing the poll is directory.

An irregularity in conducting an election, which does not deprive a legal voter of his vote, or admit a disqualified person to vote, if it cast no uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, may be overlooked in an action in the nature of a *quo warranto*.

TAGGART, J., *dissented*, holding that the irregularity of appointing an inspector in the place of one who did not appear on the morning of the election, and who acted as one of the board after the absent inspector had appeared, and the irregularity of closing the outer door of the room where the poll was held at sundown, and subsequently receiving the votes of those then in the room, rendered the whole election in the district void: that a compliance with the requirements of the statutes in relation to the manner of supplying the place of absent inspectors, and the opening and closing of the polls is necessary to the validity of an election: that where the county and state canvassers have rejected a certificate of persons claiming to be inspectors of an election for the want of proof of their official character, it devolves upon the party desiring to reverse their decision to show some legitimate evidence of the official character of the persons signing the certificate: that the law holds the act of an intruder into office void, both as it regards the public and third persons, and the mere claim to be a public officer with the performance of a single official act, does not constitute an officer *de facto;* and that the regulations prescribed by the legislature for determining the popular will in an election are to be followed strictly.

Appeal from a judgment of the supreme court at a general term, held in the sixth judicial district. The

relator Benjamin Welch, Jr., and the defendant, at the election held in November 1851, were opposing candidates for the office of treasurer of the state, and the board of state canvassers had determined and declared that the defendant was by the greatest number of votes duly elected to the office; and this action was one in the nature of a writ of *quo warranto* to defeat his title to the office, and establish that of the relator. It was tried at Tompkins circuit in March 1852, when a verdict was found in favor of the plaintiffs, upon which a judgment was rendered, which was affirmed at the general term. The facts appearing in the bill of exceptions with the ruling of the court at the trial, and the opinions of the justices of the supreme court at the general term are reported in 11 *Barb. R.* 259. The defendant appealed to this court.

*J. C. Spencer,* for appellant.

*J. A. Collier,* for respondent.

WILLARD, J., delivered the opinion of the court. This action was commenced by the attorney general, in January 1852, under title 13, chapter 2, § 432 of the code of procedure. The general object of the action was to determine whether the defendant or Benjamin Welch, Jr., was, by the greatest number of votes, elected treasurer of this state, at the general election in 1851. The cause was tried at the Tompkins circuit, in March 1852, when a verdict was found for the plaintiffs under the direction of the court, and the supreme court in the 6th district refused to set it aside on the bill of exceptions taken at the trial, and gave judgment against the defendant with costs, and adjudged that Benjamin Welch, Jr., was entitled to the office. The defendant appealed from the said judgment to this court.

The mode of testing the title of a party to an office, prior to the code was by information in the nature of a *quo warranto* (2 *R. S.* 581). Although this partook of the nature

of criminal proceedings, by reason of the judgment being in some cases followed by a fine, (2 *R. S.* 585, § 48) yet it was classed with civil remedies, in the third part of the revised statutes. The 428th section of the code abolishes the writ of *quo warranto* and proceedings by information in the nature of *quo warranto*, and enacts that the remedy theretofore obtainable in those forms, may be obtained by *civil actions,* under the provisions of that chapter. The present action was brought under those provisions and is therefore a *civil action.* The decisions of the court below are to be reviewed upon the principles applicable to *civil actions*, and not by those which prevail in criminal proceedings, when the latter differ from the former. The parties in fact stand in the same relation of equality to each other as in other civil actions. Each, on being defeated is liable to the other, as well for the ordinary costs of the action, as for an extra allowance. (*Code*, §§ 308, 309; *The People* v. *Clarke*, 11 *Barb.* 337). This is so, whether the people or Benjamin Welch, Jr., be considered as the real plaintiff. (*Ib.* § 319.)

The issue framed by the pleadings was intended to raise not merely the question which party had obtained the certificate of the state canvassers, about which indeed there was no dispute, but which party, Mr. Welch or Mr. Cook, was in truth *elected to* the office in controversy. The complaint, among other things, alleges "that Benjamin Welch, Jr., of the county of Erie, is rightfully entitled to the said office of treasurer, and the said defendant has no right thereto;" and it further alleges "that at the annual election in 1851, the said Benjamin Welch, Jr., was, by the greatest number of votes given at that election for the office of treasurer of the said state, duly elected to that office." The defendent in his answer, after setting out his title to the office under the certificate of the state canvassers, his giving the requisite security and taking the prescribed oath, alleges on "his information and belief, that at the said general election, the greatest number of votes

duly given by the qualified electors who voted for any person for the office of treasurer, was given for the defendant for such treasurer." The reply impeaches the certificate of the state canvassers for various irregularities, and especially for the omission to canvas in favor of Mr. Welch the votes of the second election district of Chesterfield, in the county of Essex, and the votes of the second election district of the fourteenth ward of the city of New York, and sundry ballots for Benjamin C. Welch, Jr., and Benjamin Welch, and it avers that the votes so given and intended for the said Benjamin Welch, Jr., and then not canvassed in his favor, from Chesterfield and New York, were enough to elect him by the greatest number of votes to the office in question. The issues thus framed, as well as the mode pursued by the respective counsel on the trial, show that the parties intended to litigate, and did in fact litigate the question, whether Benjamin Welch, Jr., received, at the general election in 1851, a greater number of votes for the office of state treasurer, than the defendant. It was not denied that the state canvas afforded *prima facie* evidence that each of the candidates received the number of votes alloted to him; and that their certificate was *prima facie* evidence that the defendant received a majority of the votes. Like all other *prima facie* evidence, it was supposed to be open to contradiction.

These preliminary remarks will prepare us to consider the various questions which have been urged on this appeal.

As the most important questions arise upon the judge's final disposition of the cause at the close of the trial, it is proper to ascertain the precise questions then determined.

On the close of the proof, the counsel for the defendant claimed that it should be submitted to the jury as a question of fact: (1st) Whether there was any fraud as to the manner of closing the polls, and in canvassing the votes in the second district of the fourteenth ward of the city of New York, and (2d) Whether the votes given for Benja-

The People *against* Cook.

min C. Welch, Jr., and Benjamin Welch, were intended to be given for Benjamin Welch, Jr. It was conceded that all other questions were questions of law and not of fact. The judge declined to submit either of these propositions to the jury, holding that there was no evidence to sustain the allegation of fraud, and inasmuch as the evidence adduced to establish the intention of the electors, who voted the ballots having on them the name of Benjamin C. Welch, Jr., and Benjamin Welch, without the addition of junior, was all on one side, and not attempted to be explained or contradicted, and sufficient to establish *prima facie* the intention of those who voted them to vote for Benjamin Welch, Jr., no question of fact was therefore left for the jury. The defendant's counsel excepted to the decision. *The whole case was then submitted to the judge* without argument, and he decided certain points which will be noticed hereafter, to some of which the defendant's counsel excepted, and the jury rendered a verdict for the plaintiffs, under the direction of the court, to which direction counsel also excepted.

The decision of the learned judge, on the two points above mentioned, depends upon the same principles, and I shall therefore consider them together. The fact assumed by him that there was no evidence of fraud in the one case, and in the other, that the intention of the voters was *prima facie* established, was not denied by the counsel for the defendant. It was not pretended that the defendant had given any evidence contradicting that on the part of the plaintiff. Nor did the counsel point out any distinct fact as evidence of fraud in the New York case. (As to the effect of a fact assumed by the court and not denied, *see* 19 *Wend.* 444.) The objection therefore comes down to a mere question of *form*, whether the judge is bound to submit to the jury as an *open question,* to find fraud without evidence in the one case, or in the other to find against a fact *prima facie* established, and which the other party has not attempted to controvert or explain; or whether he may

Sel. IV.—10.

direct a verdict in conformity to such evidence. This presents a point of practice at *nisi prius*, which must be settled according to the usage in this state.

This subject may be presented in three aspects: (1st) as to the practice *on a demurrer to evidence*: (2d) *on failure of proof on the part of the plaintiff, and* (3d) *on a failure of proof on the part of the defendant.*

(1.) *On a demurrer to evidence* the party demurring must admit every fact which the jury might find from the testimony. The decision of the cause is thus wholly withdrawn from the jury to the court, and the former have nothing further to do than, in a proper case, to assess contingent damages. (*Gibson* v. *Hunter,* 2 *H. Bl.* 187; 1 *Douglass* 133, 134, *per Buller, J.;* 3 *J. C.* 10, 159; 2 *C. R.* 133, 134; 1 *J. R.* 241; *Lewis* v. *Few,* 5 *J. R.* 1; *The People* v. *Roe,* 1 *Hill* 470.) In the present case there was no demurrer to evidence, for the cause was in truth passed upon by the jury who gave a verdict for the plaintiff.

(2.) *On a failure of proof on the part of the plaintiff,* it is well settled in this state, and has been for half a century, that the plaintiff may be compelled to be nonsuited, against his consent. (*Clements* v. *Benjamin,* 12 *J.* 299; *Pratt* v. *Hull,* 13 *id.* 334.) And it is laid down as a general rule that if the evidence would not authorize the jury to find a verdict for the plaintiff, or if the court would set it aside if so found, as contrary to evidence, in such case it is the duty of the court to nonsuit. (*Stuart* v. *Simpson,* 1 *Wend.* 376; *Demyer* v. *Souzer,* 6 *id.* 436-7-8; *Wilson* v. *Williams,* 14 *id.* 146; *Fort* v. *Collins,* 21 *id.* 109; *Jansen* v. *Acker,* 23 *id.* 480; *Rudd* v. *Davis,* 3 *Hill,* 287; *McMartin* v. *Taylor,* 2 *Barb. S. C. R.* 356, 361.) This rule was sanctioned by the unanimous opinion of the court of errors, in *Rudd* v. *Davis,* 7 *Hill,* 529. The English practice on this subject is different, as they never nonsuit the plaintiff against his consent. (2 *T. R.* 280; 1 *Barn. and Ald.* 252.) Hence with them one of several defendants is never discharged, if there is the *slightest* evidence against him.

There are dicta to the same effect, by judges in this state, when their attention has not been called to the difference between our practice and that of the English courts. (See 4 *Comstock's R.* 548 *per Mullett, J.*) The true rule is that a defendant sued in tort with others is entitled to be discharged, if the evidence against him be such that if he was sued alone he would be entitled to a nonsuit. (*Mc-Martin* v. *Taylor,* 2 *Barb. S. C. R.* 356.) The power to nonsuit results from the principle that the court is the judge of the law when there is no dispute about facts. (*Pratt* v.*Hull,* 13 *J. R.* 334, approved by Mullet, J., *in Labar* v. *Koplin,* 4 *Comstock* ,548.) The practice in relation to nonsuits, or, in present phraseology, dismissing the complaint, is, that it may be granted at the close of the evidence on both sides, or at any other time when the plaintiff admits he has no further evidence.

(3.) *On a failure of proof on the part of the defendant.* At the close of the cause, if a *prima facie* case be established on the part of the plaintiff, and it is undisputed by the defendant, it has been always usual to direct a verdict for the plaintiff. (See *Nichols* v. *Goldsmith,* 7 *Wend.* 160; *Crawford* v. *Wilson,* 4 *Barb.* 504, 518; *Rich* v. *Rich,* 16 *Wend.* 676.) This rests upon the same principle as the power to nonsuit, that the court is the judge of the law when there is no dispute about facts. Verdicts to an immense amount are daily taken under the direction of the presiding judge in cases where the defence has wholly failed. The jury assent to the direction by giving their verdict. The fact thus found is as conclusive upon the parties as if it had been the result of a long deliberation. Nor is there any thing in this practice that impairs the rights of the jurors, or the efficiency of trial by jury. It does not conflict with the maxim: *ad questionem fact·, non respondent judices; ad questionem legis, non respondent juratores.* (*Co. Lit.* 295, *b.*)

To bring a case in hostility to the maxim, it must be shown that a *controverted question of fact* was decided by

the judge, without the intervention of the jury. Here was no fact in dispute, and the jury actually gave a verdict. In the case of *The People* v. *Croswell*, (3 *J. Cases* 337,) the rights of jurors were most elaborately discussed. In his 13th proposition, (*id.* 362,) General Hamilton remarks, " That in the general distribution of powers in any system of jurisprudence, the cognizance of law belongs to the court, of fact to the jury. That as often as they are not blended, the power of the court is absolute and exclusive. That in *civil cases* it is always so, and may be rightfully so exerted;" and it was expressly asserted by Kent, J., in delivering his opinion in the same case. (*Id.* 376.) " The opinion of the judges in criminal cases," he observes, " will generally receive its due weight and effect, and in *civil cases* it can and always *ought* to be ultimately enforced by the power of setting aside the verdict." These principles were quoted with approbation by the supreme court in *Snyder* v. *Andrews*, (6 *Barb.* 48,) and have been approved in many other cases.

The judge did not in the present case decide the question of fact. He withdrew nothing from the jury. His decision amounted only to a charge to find those issues for the plaintiff. The jury might have refused to do so, or have found the other way without being liable to punishment. The only remedy for such a verdict would have been to set it aside. But the jury acquiesced in the direction, and found for the plaintiff.

The cases which show that it is not competent for the court to direct a verdict for the plaintiff, *subject to the opinion of the court*, against the consent of the parties, are not applicable to the question we are considering. (*Ely* v. *Adams*, 19, *J. Pe.* 313; *Hyde* v. *Stone*, 9 *Cowen*, 230.) The principle decided in *Nichols* v. *Goldsmith*, (7 *Wend.* 163,) and *Rudd* v. *Davis*, (3 *Hill*, 287,) *affirmed in error*, (7 *Hill*, 529;) *Crawford* v. *Wilson*, and *Rich* v. *Rich*, *supra*, sustain the ruling of the court below. If the refusal of the learned judge to submit the foregoing questions to the

jury, be deemed a refusal to permit the defendant's coun-
sel to address the jury thereupon, it was not the subject of
an exception. Whether counsel shall be permitted to ad-
dress the jury, is a matter resting in the sound discretion
of the court. This has always been so treated. Under the
former constitution there was a time when all causes origin-
ating in justices' courts were required to be submitted in
the supreme court without an oral argument. The courts
in this state have for a long time limited the number of
counsel to address the jury, when a cause was to be
summed up, and to examine and cross-examine witnesses.
The convention of judges held in August last, under § 470
of the code of 1852, embracing the judges of the supreme
court, superior court of New York, and court of common
pleas of that city and county, by a general rule, restricted
the number of counsel to be heard on each side at general
and special terms to one, and the time beyond which they
should not be heard, except when otherwise ordered, to
two hours each. (See *Rule*, 13 *and* 14.) A similar rule
exists in the supreme court of the United States, and this
court limits the number to be heard on a side. All these
restrictions imply that the right to address the jury or the
court, is not an absolute, unqualified right, to be exercised
·by as many counsel as may be employed. The courts on
the same principle limit the number of witnesses to be
examined on a side, in all collateral issues; (*Nolton* v.
*Moses*, 3 *Barbour, S. C. R.* 36; *Spear* v. *Myers*, 6 *id.* 445;)
and doubtless may do so on the main issue. On the same
principle, too, it rests in the discretion of the court
whether a witness once examined, may be recalled and ex-
amined further on the same or other subjects. (*Law* v.
*Merrills*, 6 *Wend.* 276, *per Walworth, Ch.; The People* v.
*Mather*, 4 *Wend.* 246; *C. & H., notes* 711, 788; *Dunckle*
v. *Kocker*, 11 *Barbour*, 387.) If the judge at the
trial errs in the exercise of this discretion, the remedy is
by motion for a new trial on a case. It is well settled that
a bill of exceptions can not be taken to review the exer-

cise of discretionary power. (*C. & H. notes* 711, 788, where many of the cases are collected.)

In this aspect of the case then, an appeal will not lie for the refusal of the judge to permit the counsel to address the jury on the questions now under discussion, there being no question of damages to be passed upon. *In point of form,* therefore, on the facts assumed by the learned judge, there was no error in directing a verdict for the plaintiff, instead of submitting the matter as an open question to the jury. The manner of stating the question on the record, is not according to the usual practice, but it is nevertheless intelligible. I have hitherto treated the case as if the facts in relation to those points were all on one side, as stated by the judge. If so there was no fact in dispute. Whether the judge was right in that assumption or not, could more properly be reviewed in the court below on a case containing the whole evidence. The exception does not point to the fact that the judge was wrong in his assumption of what was established by the evidence, but to the legal conclusion which he deduced from it. The learned judges in the court below, have moreover discussed these questions of fact in an able and elaborate manner, and shown to my satisfaction, that the judge at the trial was right in his assumption. It would be a waste of time to travel over the same ground.

It is well settled also, that when on the trial of a cause, a fact is assumed by the court and counsel to exist, and the case is disposed of at the trial upon such assumption, the nonexistence of the fact in the case presented to the court on a motion for a new trial, can not be urged in opposition to the application for a new trial. (*Beekman* v. *Bond,* 19 *Wend.* 444.) This must be so likewise on a bill of exceptions, when the *nonexistence* of the fact is not made a point in the court below.

The range of the discussion, however, on this appeal, has made it necessary, or at least expedient, that a few words should be added on this branch of the subject; and

The People *against* Cook.

(1st) *Of the question of fraud* in the New York case. Fraud can never, in judicial proceedings, be predicated of a mere emotion of the mind, disconnected from an act occasioning an injury to some one. A fraudulent transaction implies a wrong done, as well as a person wronged. The term *fraud* when applied to inspectors of an election, implies, *ex vi termini*, that some legal voter has been designedly and wrongfully deprived of his vote, or that an illegal vote has been purposely and unjustly received by those officers, or that a false estimate has been imposed upon the public as a genuine canvas. In the present case, however, the judge was asked to submit to the jury to find fraud in the inspectors of the 2d district of the 14th ward in the city of New York, from certain actual or supposed irregularities, in a case where it appears from the record, that it was not shown or alleged on the trial that any illegal votes were received, or legal votes rejected, and in the face of the testimony of all the inspectors, embracing both political parties, and which was not contradicted, that the votes of the district were fairly and honestly received, and accurately canvassed and returned. With respect to that return the defendant is the assailant and holds the affirmative. It will be shown in another connection that it should have been received by the county canvassers. The legal presumption is in its favor.

It is no answer to this, that the irregularities of the inspectors have rendered it impossible to detect the fraud. The decision of the learned judge with respect to these irregularities belongs to another execption. We are now upon the exception to this decision, refusing to submit to the jury, to find fraud without evidence in closing the polls and canvassing the votes in that district. This is quite a different matter from the question of irregularity, and must be kept distinct from it. The judge did not err in refusing the motion of the defendant's counsel in this respect.

(2d) *On the refusal to submit to the jury whether the votes*

*for Benjamin C. Welch, Jr., and Benjamin Welch were in-
tended for Benjamin Welch, Jr.* What that decision in re-
ality was, and the grounds of it, have already been shown.
A few words more will be added. The court did not treat
the *question of the intention* of the voters who deposited
the defective ballots as a question of law. It was treated
throughout as a question of fact, to be established by the
evidence. The ground taken by the judge was, that the in-
tention of the voters to vote for Benjamin Welch, Jr., was
*prima facie* established, and not attempted to be explained
or contradicted, and there was therefore no question of
fact for the jury. His decision was a mere direction or
charge to the jury, to find for the plaintiff with respect to
those matters, and they found accordingly. The evidence
was not withdrawn from them, but in truth passed upon by
them. It was not indeed submitted as an open, contro-
verted question, or summed up by counsel. But when that
*intention* of the voter was placed beyond dispute, as it was
in this case, by the evidence, it became a pure and unmixed
question of law, whether those defective ballots should, on
this trial, be allowed to Benjamin Welch, Jr., or not. The
result was the same as if the judge had charged the jury
that if they believed that the voters intended by the de-
fective ballots to vote for Benjamin Welch, Jr., of which
there was no doubt, those votes in point of law should be
estimated by them to Mr. Welch.

It was unnecessary to decide that those defective ballots
should have been allowed and canvassed to Benjamin
Welch, Jr., by the state canvassers. The court did not say
as matter of law, irrespective of the extrinsic facts proved,
that Benjamin C. Welch, Jr., and Benjamin Welch, without
the junior, meant Benjamin Welch, Jr. It was the extrinsic
evidence that made the intention of the voters obvious.

In my own opinion the state canvassers act ministerially
in the main in making their certificate. They can not be
charged with error in refusing to add to the votes for Ben-
jamin Welch Jr., those which were given for Benjamin C.

Welch, Jr., and for Benjamin Welch, without the junior. They had not the means which the court possessed on the trial of this issue of ascertaining by evidence *aliunde*, the several county returns, the intention of the voters and the identity of the candidate, with the name on the defective ballots. Their judicial power extends no further than to take notice of such matters of public notoriety, as that certain well known abbreviations are generally used to designate particular names, and the like.

It is enough probably to say, that the legislature has *not* clothed, either the state officers or the subordinate boards of inspection with power to hear and determine, by the means of evidence *aliunde* the return, the intention of the voters. The strictness with which these boards should be held to the record before them, is dictated by sound policy and enlightened wisdom. Who could desire to see the close of every canvas followed up by a rush of heated partizans to disprove by their testimony the estimate made by the proper authority?

But the question whether the state canvassers ought to have allowed to Mr. Welch the defective ballots, is not necessarily involved in this case, if this court shall be of opinion, that on the trial of this cause, it was competent to go behind both the certificate and ballot box, to ascertain the voters' intention in depositing the ballots in controversy.

It has been strenuously insisted by the counsel for the appellant that the court does not possess this power. He insists that the court can go no further in this action than to correct *mistakes* of the returning officers and to prove facts, which show the return to be false, and to make it such as it ought to have been made by the canvassers. Such errors, whether intentional or otherwise, no doubt can be corrected by this action, and many of the cases referred to on the argument did not require a more searching remedy.

This question is of sufficient importance to be viewed upon principle and authority.

Sel. IV.—11

(1.) *Upon principle.* It is by the popular expression by the voters through the ballot box that a title is derived to an elective officer. The certificate of the board of canvassers is mere evidence of the person to whom a majority of the votes were given. The certificate may indeed be conclusive in a controversy arising collaterally, or between the party holding it and a stranger. But when this pro ceeding is instituted in the name of the people it loses its conclusive character and becomes only *prima facie* evidence of the right. The pleadings in this case, it has already been shown, were so framed as distinctly to present the question, whether the ballots now in controversy were intended by the voters for Benjamin Welch, Jr. If the issue thus tendered by the plaintiff was irrelevant, the defendant should have moved to strike it out. By taking issue upon it and going down to trial, and litigating the facts involved in it, he concedes its materiality. This concession, it is true, is not conclusive upon the court; but I think it was the intention of the code, and certainly it was of the pleaders on both sides, that the issue should involve an inquiry into the right to the office as derived from the highest source of popular sovereignty, and not merely the right derived from the certificate. It will be seen that the pleadings in this case are essentially different from the precedents under the former practice in analogous proceedings: (see the forms in *The People* v. *Van Slyke,* 4 *Cowen,* 297.)

(2d.) *Upon authority.* In the case of the *People* v. *Ferguson,* (8 *Cowen,* 102,) decided in 1827, a new trial was granted by the supreme court to enable the relator to prove on the trial of the issue, that votes given for H. F. Yates were intended by the voters for Henry F. Yates. That was an information in the nature of a *quo warranto* to determine whether Ferguson or Yates was elected clerk of Montgomery county. If on that trial 14 ballots on which were written H. F. Yates were allowed to Henry F. Yates, he would be entitled to the office, instead of Ferguson, to whom the certificate was given by the county canvassers.

That case is exactly in point, and goes further, indeed, than is necessary in the one under consideration. The late chief justice Savage, in the course of his opinion in that case, says, you may look˙ beyond the ballot boxes for testimony as to the intention of the voter, and that the question of intention is fairly for the jury. This doctrine was approved by the same court in *The People* v. *Seaman*, (5 *Denio*, 409,) decided in 1848, in a similar proceeding, to test the title of the parties to the office of supervisor. In the earlier case of *The People* v. *Van Slyck*, (4 *Cowen*, 297,) an information in the nature of a *quo warranto* was brought to oust the defendant from the office of sheriff. It was insisted by the defendants' counsel that the decision of the canvassers was conclusive and could not be reviewed but by *certiorari;* and that the certificate of the canvassers could not be impeached in this way; but the court held that the certificate was not conclusive; and on a special verdict, finding that the vote of one town had been improperly rejected by the county board, which, if received, would have altered the result, they ousted the defendent. This case shows that the court may go behind the certificate. It shows, also, that it is the *election,* and not the certificate of the canvassers that gives the *right* to an office.

In *The People* v. *Vail,* (20 *Wend.* 12,) the case of *The People* v. *Ferguson* is expressly recognized as sound law; and Bronson, J., says that in those legislative bodies which have the power to judge of their own members, it is the settled practice ˙when the right of the sitting member is called in question, to look beyond the certificate of the returning officers; " and I think," he observes, " a court and jury, with better means of arriving at truth, may pursue the same course." We are not called upon to say that every possible question, arising under the election law, may be corrected in this way. It is enough that the principle contained in *The People* v. *Ferguson* sustains the ruling of the court below. That case has stood the scrutiny of more than a quarter of a century; and has neither

been disturbed by the new constitution, nor the repeated revision of the election law. I see nothing in the present case that requires us to depart from it.

Nor is there any danger to be apprehended to the security of our institutions by pursuing this practice. The right to an office is no higher than a right to life, liberty, or property. There is no principle that should withdraw the first from the cognizance of a court and jury, to the exclusion of the last. Both will, indeed, be safe under the administration of the ordinary tribunals.

It now remains to notice the other questions of law, which are presented by the record.

(1.) The learned judge decided in his direction to the jury, that the votes given in the western district of the 1st ward of the city of Buffalo, were properly canvassed and allowed to Mr. Welch, notwithstanding the inspectors took the oath of office upon a book called " Watts' Psalms and Hymns," and not upon the gospels; notwithstanding these challenged voters and two of the clerks were sworn upon the same book, it being beyond dispute that in each case, the affiants supposed the book to be a testament or bible, and were ignorant of the fact that it was otherwise. To this the defendant's counsel excepted.

This exception is not well taken for two reasons: (1st.) The neglect of the inspectors or clerks to take *any oath*, would not have vitiated the election. It might have subjected those officers to an indictment, if the neglect was willful. (*L. of* 1842, *p.* 132, § 19, *and* 2 *R. S.* 696, § 38; *In the matter of the election of the Directors of the Mohawk and Hudson R.R.* 19 *Wend.* 135; *Greenleaf* v. *Low*, 4 *Denio*, 168; *Weeks* v. *Ellis*, 2 *Barb. S. C. R.* 320.) These and numerous other cases show that the acts of public officers being in by color of an election or appointment, are valid, so far as the public is concerned.

(2.) The oath in this case, though irregularly administered, was a valid oath. If the party taking it makes no objection to the mode of administering it at the time, he

is deemed to have assented to the particular form adopted, and is liable to all the consequences of perjury, as if it had been administered in strict conformity to the statute. (*C. and H. notes* 705; *id.* 1503; *Cody* v. *Norton,* 14 *Pick.* 236; *Commonwealth* v. *Buzzell,* 16 *id.* 153.)

The challenged voters are as amenable to an indictment for perjury as if they had been sworn on the gospels. The learned judge therefore committed no error, in holding that the votes in Buffalo above mentioned, were properly canvassed and allowed to Mr. Welch.

(II.) The ballots for Benjamin Welch, Jr., in the several election districts in Herkimer county, in which the specimen ballot headed " State" had at the bottom " For County Judge, Ezra Graves," were properly canvassed and allowed to Mr. Welch. Whatever effect this might have upon the ballot for county judge, it had none upon other candidates upon the state ticket. The statute forbids inserting on the same ballot more than one name for the *same office.* (*L. of* 1842, *p.* 118, § 8.)

The judge did not err, therefore, in holding that the Herkimer votes were rightfully allowed to Mr. Welch.

(III.) There was no good reason for rejecting the votes in the second election district of the town of Chesterfield. There was sufficient proof that the gentlemen acting as inspectors were such *de jure;* and if not, it will be shown under another head that they were at least so *de facto,* and that that was sufficient to support their acts. The county canvassers of the county of Essex had no right to reject the certificate of the board of inspectors. It was regular on its face, and presented to them in time. The statute has nowhere invested them with the power which they assumed to exercise. (*L. of* 1842, *pp.* 124, 125.)

The 15th section, which authorizes the county board to depute one of their number to return the certificate of the district inspectors to those officers, to supply omissions and correct clerical mistakes, if any exist, and to adjourn in the mean time to allow the corrections to be made, is all

the correcting or revising power which the county board has over the district board. The corrections in this case are to be made by the latter board, and they are not permitted to alter any decision before made by them. The learned judge was right, therefore, in holding that those votes should be allowed notwithstanding they had been rejected by the county canvassers, and were not included in the estimate of the state canvassers.

(IV.) The votes given in the second election district of the town of Williamsburgh, were canvassed by the county and state canvassers, to Benjamin Welch, junior. The defendant, in seeking to reject them, holds the affirmative. He takes upon himself the business of showing, either that the number of votes have been untruly canvassed, or that some other facts exist which invalidate the certificate. (1st.) From the record it appears that no illegal votes were received in said district at said election, and no legal votes were offered and rejected; that all the votes given at said election were honestly canvassed to the respective candidates, and a true and faithful return of said votes were made by the inspectors. There was no dispute about these facts, and the evidence was received without objection. The defendant therefore failed to show that he sustained any injury by any act of the inspectors, or that their certificate did not truly state the result of the popular will at that poll.

(2d.) The defendant failing to show the return false, seeks to reject it altogether, on account of the noncompliance by the inspectors with some of the provisions of the election laws. There are various duties enjoined by law on the inspectors, the great objects of which are: (1.) To afford to every citizen having a constitutional right to vote, an opportunity to exercise that right. (2.) To prevent every one deprived of that right from voting. And (3.) To conduct the election in such a manner in point of *form*, that the true number of legal votes can be ascertained with certainty. If all these objects be accomplished, as they seem to have been

in this case, to reject the whole votes because the inspectors failed to comply with every prescribed regulation, would be, as was well remarked by one of the judges in the court below, to place a higher value on the statute regulation, than on the right itself. It would be a sacrifice of *substance* to *form.*

It is proper, however, to examine these objections, and to see whether the irregularities complained of have rendered the state of the poll in that district, so doubtful and uncertain that no reliance can be placed upon it.

The first objection I shall consider, relates to the inspectors of the election. It appears by the record that the inspectors who opened the polls in the morning were not regularly sworn, and that they were appointed by the supervisors, town clerk and a single justice, "Inspectors of the election for the second district of the town of Williamsburgh, *to act until others are appointed.*" It was dated November 4th, 1851. It appears that there were inspectors elected for that district, but they were not present at the opening of the polls. There can be no doubt that this appointment was a colorable authority for those inspectors, and that their acts in that capacity were valid, so far as third persons are concerned. Their omission to take the oath in due form did not invalidate their acts. The defendant's counsel does not deny that these inspectors were officers *de facto ;* but he insists that their appointment made them inspectors for the entire election, and thus vacated the office of the elected inspectors. And if so, the latter could not act at all, and were not even inspectors *de facto.* I think this result would follow if the inspctors in question had been legally appointed under the 22d section of the act. (*L. of* 1842, *p.* 117.) But there was a defect in their appointment. The statute contemplates that at least two of the justices should sign it, without which in the country towns, there would not be a majority of the appointing power. In the absence of proof to the contrary we must intend that there were the usual number of jus-

tices in the town. There not being the requisite number of officers concurring in the appointment, it was defective There was still another defect. The statute contemplates that the inspectors should be appointed *to supply the vacancy of those absent.* Although it is silent as to the duration of their offices, yet it is obviously for that election. In this case they were appointed " *to act until others were appointed.*"

The town officers supposed that they had the right of making an appointment during their pleasure. I think they had no such power. The appointment merely gave them a colorable authority, and did not displace the elected inspectors. The latter, on appearing at the polls, had a right as inspectors *de jure* to take the charge of the election and to make the return.

The statute requires that the inspectors, after taking the oath, shall appoint two clerks, who shall take the constitutional oath. (*Laws of* 1842, *p.* 118, §§ 3 *and* 4.) This is directory. If no clerks can be procured the election is not to fail. The inspectors must perform the duty which ordinarily is devolved upon the clerks. The failure of the clerks to take the oath did not render their acts void. The occasional interference of more inspectors than three does not prejudice the return, since the whole election was conducted by inspectors who were at least such *de facto,* and for the most of the time by those who were such *de jure.*

It is not to be disguised that there were irregularities in this district for which the inspectors were censurable, and perhaps liable to be punished by indictment. Had the defendant's counsel contended on the trial that these irregularities rendered the state of the canvas uncertain, he should have asked to go to the jury with the question whether the votes were accurately canvassed or not. By omitting to do so, and by conceding that the questions were questions of law, and not of fact, and allowing it to be proved without objection that the votes were accurately canvassed, nothing was left but the abstract question whether an omission to comply with the statutory require

ments in question, *per se* invalidated the votes of that district. If these requirements be directory and not jurisdictional, the learned judge was right in deciding that the votes were properly allowed.

The cases on the subject of what provisions in the statute relative to the elections are directory and what are jurisdictional or imperative, are elaborately collected and examined by the learned judges in the court below, and I do not deem it necessary to review them at large. I will merely refer to some of them. (*Doughty* v. *Hope,* 3 *Denio,* 251; *Elmendorf* v. *The Mayor of N. Y.* 25 *Wend.* 696; *Merchant* v. *Langworthy,* 6 *Hill,* 646; *ex parte Heath,* 3 *Hill,* 43; *Jackson* v. *Young,* 5 *Cowen,* 269; *Stryker* v. *Kelly,* 7 *Hill,* 9; *People* v. *Peck,* 11 *Wend.* 604; 19 *Wend.* 143; and see *Smith on Statutes,* 782, 799, where the cases are reviewed.) Upon the analogy of these and other cases the requirements of the statutes which were not complied with, are clearly directory. An officer *de facto* is one who comes into office by color of a legal appointment or election. His acts in that capacity are as valid, so far as the public is concerned, as the acts of an officer *de jure.* His title can not be inquired into collaterally. The doctrine on this subject will be found in the following cases:—*The People* v. *Bartlett,* 6 *Wendell,* 422; *same* v. *White,* 24 *id.* 525, 539, 564; *same* v. *Covert,* 1 *Hill* 674; *same* v. *Stevens,* 5 *Hill,* 616; *same* v. *Hopson,* 1 *Denio,* 575; *Weeks* v. *Ellis,* 2 *Barb. S. C. R.* 324; 3 *Barn. and Ald.* 266, 270.) Third persons can justify under officers *de facto,* (*Weeks* v. *Ellis,* 2 *Barb. S. C. R.* 320; 3 *Barn. and Ald.,* 266; *Wilcox* v. *Smith,* 5 *Wendell,* 231.) Had the sheriff or constable arrested a disorderly person, under authority from either of the boards of inspectors, who were merely such *de facto,* he would have been protected. The person of the voter is as securely guarded under the authority of inspectors *de facto,* as of inspectors *de jure.* A challenged voter swearing falsely before a *de facto* board of inspectors, is as much liable to punishment under the statute as if the oath had been ad

SEL. IV.—12

ministered by inspectors *de jure*. (*L. of* 1842, *p.* 134, § 1; 2 *R. S.* 681, § 1; *State* v. *Hascall*, 6 *N. H. Reps.* 352; 2 *C. and H.* 1101; *Van Steenbergh* v. *Kortz*, 10 *J. R.* 167; *Howard* v. *Sexton*, 1 *Denio*, 440.) In the latter case, Bronson, J., says, "if parties should go to trial before a judge or justice of the peace who had not taken the oath of office, I think a witness who should swear false on such trial could not escape the pain of perjury." And it is laid down by *Hawkins*, (*P. C., book I. ch.* 69, § 4,) that a false oath taken before commissioners, whose commission at the time is in strictness determined by the demise of the king, is perjury, if taken before such time as the commissioners had notice of such demise." (*Bac. Ab. Tit. Perjury,* (A). Such officers after the demise of the king and before notice, are merely officers *de facto*.

The learned judge did not decide that inspectors 'might lawfully omit at their pleasure any of the requirements of the statute. He merely held that the votes received in the said district, under the circumstances disclosed, were not to be rejected on the trial of this issue, but should be allowed to the respective candidates.

The counsel for the defendant contends that the failure of the inspectors to comply with any of the various provisions of the statute, is analogous to an erroneous decision of a judge at *nisi prius*, in receiving or rejecting evidence improperly. But the cases are in no respect parallel. The error of the judge in the latter case has a direct tendency to injure the party against whom the decision is made. The error of the inspectors in the former case has no tendency to injure one candidate more than the other. Indeed it has no *necessary* tendency to injure any body. It is the error, moreover, of the inspectors, and not of the court.

V. The learned judge did not err in his direction to the jury, that the votes in the second district of the 14th ward of the city of New York, were improperly rejected by the county canvassers. It has already been remarked, in considering the Chesterfield case, that the county board had

no right to reject a certificate of the district inspectors, which is fair on its face, and delivered to the proper officer within the time allowed by law. The county board should have received and returned these votes to the state canvassers. This point, however, is not of much importance in this stage of the cause, since either party had a right to go behind the certificate and show it to be false. Had the county board of New York conducted the canvas legally, the burthen of proof would have been shifted from the plaintiff to the defendant.

There are but two points in this part of the case which have not already been disposed of, against the defendant, under some one or more of the preceding heads: (1st.) Closing the outer door at sundown and preventing any person from entering the room where the poll of the election was held; and (2d.) Receiving the votes of those already in the room at the time the outer door was closed, ten or fifteen in all.

In considering these points it must be borne in mind that it is not enough for the defendant to show that the poll was kept open *after* sundown, or that the door was shut *before* that hour; such a technical deviation from the direction of the statute, can not avail him unless he can also show that the *hour* of opening and closing the poll is of the essence of an election. He did not propose to show that any legal voters were excluded by the act of closing the outer door, or illegal ones received *after* sundown. He conceded that the questions arising upon those facts were questions of law for the court, and the learned judge made his decision with the fact distinctly appearing, that no legal votes were rejected or illegal ones received.

It must be borne in mind, further, under this branch of the subject, that the constitution is *imperative* with respect to the *day* on which our annual elections shall be held. (*Constitution, Article* 3, § 9.) Should the legislature *direct* it to be held on a different day, as they are empowered by that instrument to do, such *day* would be imperative also

The constitution is silent with respect to the *hour* of the day at which the poll shall be opened and closed. The regulation of that matter is thus left to the legislature, and, when they do not interfere, to the common law. The statute requires that the poll shall be open in the cities at sunrise, and shall be kept open till the setting of the sun. (*Laws of* 1842, *p.* 118, § 6.) (1st.) No elector had any right to complain if the door was shut and the poll closed at sundown. He was not deprived of any right. The act of closing the outer door at that time can not be urged as prejudicial, unless it is shown that some one was prevented from voting. (2d.) The receiving the votes of electors already in the room, has not been shown to be an error prejudicial to the defendants. Whether these votes were for him or against him does not appear. If they were all against him and were now rejected, it would not alter the result. If they were in his favor he has no right to complain. (19 *Wendell*, 635, 638.)

The statute contains no words forbidding the poll to be held open after sundown, or rendering the election void, if the poll be not opened and closed as therein required. The inspectors may indeed be liable to an indictment for the wilful violation of any of the statute regulations, but that is quite a different matter from the point we are considering.

If the particular hour of the day for opening and closing the poll be directory, and not imperative, the learned judge did not err in holding that the votes in the district in question should be allowed to Mr. Welch. The cases on the subject of what acts are directory, and what imperative, have already been stated, and need not be repeated. It has been held with regard to corporations, that the words " between the hours of ten in the morning and two in the afternoon," are not imperative, but merely directory, and an election may well be begun at any other *reasonable* hour. (*Angell and Ames on Corporations*, 94.) The particular *hour* in the day is not the *essence* of the thing required to be

done. Should inspectors on a cloudy day, and misled by a defective timepiece, close the polls a few minutes *before* sundown, or receive a few votes *after* that hour, if the time of day be of the *essence* of the thing, the whole election for that district would be void. I can not subscribe to this doctrine. I think the statute is directory.

Again, to show more clearly that the hour of closing the polls is *directory* and not *imperative*, suppose after every voter in the district had deposited his ballot, the inspectors should have closed the poll, although the sun was still an hour high; or suppose they had kept it open an hour *after* sundown, and no vote had been offered or received; who, in either case, would have had a right to complain? Not the candidates, surely; for, with respect to them, the whole object of opening the poll at all, had been accomplished. If the irregularity were *wilful*, the inspectors might, indeed, be punished by an indictment; and this, I apprehend, is the extent of the remedy.

I do not intend to assert that there may not be departures from the statutory requirement, with respect to the time of opening and closing the polls, and with respect to some other matters which would put in hazard the whole vote of the district. It will be time enough to pass upon such a case when it arises.

It is probably impracticable to prescribe a rule which will enable us to determine, in all cases, what irregnlarities of the inspectors will vitiate an election. It may be safely affirmed, that if the irregularity does not deprive a legal voter of his right, or admit a disqualified person to vote; if it casts no uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, it may be overlooked in an action of this kind, when the issue is as to which candidate received the greater number of votes, for a particular office, at a given election. There is nothing in this principle which holds out the slightest invitation to disorder at the polls. Should a gang of rowdies gain possession of the ballot box, during

or after the close of an election before the canvas, and destroy the whole or portions of the ballots, or introduce others surreptitiously into the box, so as to render it impossible to ascertain the number of genuine ballots, the whole should be rejected. It would in such case be the duty of the district inspectors to certify and declare the fact. But the county canvassers, with a regular return from the district inspectors before them, which is fair on its face, have no right to go behind it, and prove that its estimates are unreliable by reason of rowdyism at the polls, or irregularities of the inspectors. They must act upon it as a regular return, and leave the parties aggrieved to their remedy through the courts of justice.

There were some exceptions of minor importance taken at the trial, which I have not noticed, because they were either frivolous or immaterial, and have not been urged on the argument. The objection that the canvas in the 2d district of the 14th ward of New York was not public, does not apply to the state ticket, and has therefore not been noticed.

The judgment of the supreme court should be affirmed.

TAGGART, J. (dissenting.) This is a proceeding in the nature of a writ of *quo warranto* to remove the defendant from the office of treasurer of the state of New York, and to invest the relator with such office.

By the official state canvas of votes given at the general election held in 1851, the defendant was declared elected to that office.

The state canvassers estimated the votes given for the defendant at 200,693, and the votes given for the relator at 200,465, which would give the defendant an apparent majority of 228. It is conceded that the defendant was entitled to the vote in the 3d district in the town of Catskill, Green county, being a majority of 106, which would increase his majority to 334.

I propose, before entering into the discussion of the

questions which I intend to examine, to allow the relator the following votes, not estimated in the canvas by the state canvassers, viz: Votes given Benjamin C. Welch, jr., in Ontario county, 32; Benjamin Welch, in Chemung county, 68; and to the same in Tompkins county, 47; making in the whole 147. This number deducted from the defendant's majority of 334 will still leave him a majority of 187.

To overcome this majority the relator claims that the votes given in the second district of the 14th ward in New York which gave the relator 266 majority, and the votes in the second district in the town of Chesterfield, Essex county, which gave the relator 25 majority, should be allowed to him. These majorities, in the aggregate amounting to 291, would overcome the majority of 187 for the defendant, and leave a majority of 104 for the relator.

The defendant insists that these votes should not be allowed, and claims that the vote of the second district in the town of Williamsburgh, which gave the defendant a majority of 152, and which was allowed by the state canvassers, should be deducted from the relator's vote so allowed. The relator is not entitled to sustain the judgment, unless the votes above referred to, both in New York and Williamsburgh, should be allowed. The votes in Chesterfield will not change the result.

The only questions I propose to examine in this case, relate to the votes above referred to in New York, Chesterfield and Williamsburgh; and in examining these questions, I shall lay out of view all of the objections in relation to the clerk of the polls, the manner of administering the oath, and whether the clerks, inspectors and voters were or were not properly sworn, or were or were not sworn at all, and confine myself to the questions relating to organization of the several boards of inspectors, whether they were legally organized, the elections legally conducted, the canvas legally made, and whether the irregularities complained of vitiate and destroy the election.

The facts in relation to the election in New York, are that in the temporary absence of two of the inspectors, O'Neill the third inspector appointed McLaughlin inspector, McLaughlin acted as inspector three times during the day, at one time with one other inspector, at one time with two others, and at another time with three other inspectors; first acting with O'Neill until Price, one of the absent inspectors, returned, and then with O'Neill and Price until Gilmore the other absent inspector returned, and when they both returned he ceased acting.

At a subsequent time McLaughlin returned and acted as inspector with Price and Gilmore in the absence of O'Neill, and afterwards acted as inspector sometimes with one and sometimes with two, until all three of the regular inspectors had returned, when he ceased to act for the time and went away, and that near the time of closing the polls, McLaughlin returned to the poll room.

Price, one of the inspectors, upon looking at his watch discovered it was sun down, and so informed McLaughlin and O'Neill, and said it was time to close the polls. The inspectors, McLaughlin acting as one of the three, then agreed to close the polls, acting upon the idea and belief that it was sun down; they agreed to and did close the outer door of the large room in which the electors were, prevented all others from coming in and received the votes of those in the room ready to vote; those in the room ready to vote voted, some ten or fifteen in all; all was done within ten minutes, and all done after sun down, and the polls were then closed; between the time Price announced it was sun down and the time of closing the polls, four persons, including McLaughlin, acted as inspectors a part of the time; it appeared that no legal votes were rejected, and all the legal votes offered were honestly received and placed by the inspectors in the appropriate boxes; that as soon as the last vote was received the usual proclamation closing the polls was made and the polls closed.

Section 21 of title 3, of the laws of 1842, provides that

The People *against* Cook.

at each town meeting to be held in the several towns of this state and at each annual charter election, to be held in the several cities of this state, the electors of said city or town, shall be entitled to vote by ballot on the same ticket with other town or charter officers for two electors residing in each election district of such town or city, to be inspectors of election for such city or town; and the two persons in each district receiving the greatest number of votes shall be two inspectors of election for such district at all elections the ensuing year. The presiding officers of such town meeting or charter election shall immediately after the votes of such town meeting or charter election shall be canvassed, appoint by writing subscribed by a majority of such presiding officers another inspector of election for each election district to be associated with said two inspectors so elected, and who shall thereupon be one of the inspectors of election of such district. Such inspector shall be selected from the two persons in such election district who shall have the highest number of votes next to the two inspectors so elected.

Section 22 provides that in case of vacancies, the supervisor, town clerk and justices of the peace of the town, shall designate and appoint as many inspectors of such election district, as shall be necessary to supply the vacancies, and shall file a certificate of such appointment in the office of the town clerk; *and the persons thus appointed shall be inspectors of such election for such district.* And all vacancies that may exist or occur in the office of inspector of election in any city shall be filled by the common council of said city.

Section 3 of title 8, provides that if a majority of the inspectors shall not be present on any day on which an election is held, the inspectors or inspector attending shall appoint so many electors of the town, ward or district as may be necessary to form a board.

Without referring to other irregularities in conducting this election in relation to which I do not intend to express

Sel. IV.—13.

an opinion, I think there was one error committed which renders the election in the district absolutely void. I am not disposed to controvert the position that the acts of *officers de facto* can not be impeached collaterally, but are binding and conclusive so far as the public or third persons are concerned; but I insist that the principle does not apply where a person obtrudes himself into an office, and undertakes to exercise the duties thereof without the first requisite of official authority.

In this case McLaughlin was appointed inspector to fill a temporary vacancy. I will not dispute the legality of such appointment, although I think it may well be questioned. Admit that McLaughlin was legally appointed; by virtue of such appointment he could only act until a majority of the inspectors should attend: when that contingency happened his functions ceased, and he was no longer an officer, either *de jure* or *de facto*; but he continued to act till both returned, and then ceased acting as an inspector, for the time. It seems to me perfectly clear that from that time he could have no further power or authority as inspector, and every act of his subsequent to that time, was absolutely null and void. He was from this time a mere intruder, having no more right or authority over the ballot boxes than any private citizen. Yet he subsequently returned and officiated as inspector, without any new appointment, sometimes with one and sometimes with two other inspectors. At times when he was acting with only one inspector, there was in reality no board, but the election was conducted by one inspector alone. Again he returned and officiated as inspector with all of the others, increasing the number of inspectors to four. If this proceeding can be tolerated, and the election held valid, there is nothing to prevent the whole number of electors in the district from acting as inspectors, except the physical impossibility of their officiating together in a single body. But it is unnecessary to pursue this subject farther, as it is not pretended that the election was regu-

The People *against* Cook.

larly conducted, but simply that the election should not be held void on the sole ground of the irregularities, no fraud having been shown.

In this connection it may be important to determine what is meant by the provisions of the statute *defining the number of inspectors, the manner of their election or appointment, and the organization of the board.*

The legislature has provided for the election of two, and the appointment of one inspector. The one to be appointed is to be selected from the two highest who were not elected. Is it reasonable to suppose that the legislature would thus in effect limit the number of inspectors to three, debar the people from voting for a greater number than two, and yet allow one of the inspectors chosen or appointed to increase the number not only to four, but to any number his fancy, whim, or partiality may dictate to him? For if it is settled that McLaughlin was a legal inspector after the return of Gilmore, a precedent will be established for any conceivable increase in the number of inspectors, and the board may become a mere rabble, without order, and beyond control.

I think these provisions of the statute are something more than merely directory. An election can not legally be held by more than three, nor less than two inspectors; and if this principle is violated the election is void, and the certificate of the inspectors should not be regarded. Suppose the certificate in this case had been signed by the four inspectors, McLaughlin included, would the board of canvassers have been bound to receive it? I admit that if the certificate had been signed by only two of the inspectors, it might have been received, on the ground that the officers are presumed to do their duty, and the court will presume that the third inspector was present and participated in the acts of his associates, although he did not sign the certificate. Not so where the certificate is signed by four. Such certificate carries on its face evidence of its illegality. The election was held by a person acting

as inspector who was not an inspector *de facto,* but was a mere intruder.   For the above reasons I consider the election in the second district of the 14th ward of New York as absolutely void, and the votes ought not to be allowed.

The preceding remarks will also apply to the election in the second district in the town of Williamsburgh.   In that district James Hanford, James Murphy and Jeremiah Holmes were sworn and acted as inspectors, under an appointment signed by Abraham Berry and J. D. Sparham, supervisors, H. C. Boswell, justice, and John T. Bunce, town clerk.   Such inspectors opened the polls and continued to receive votes and act as inspectors until about nine o'clock, when Smith, one of the elected inspectors, came and commenced acting as inspector.   When Smith came, Hanford, one of the appointed inspectors, left, and ceased acting as such.   About eleven o'clock, Burdett, another of the elected inspectors, came, and Burdett, Smith, Murphy and Holmes all acted as inspectors a short time, and then Murphy ceased acting as inspector, and Smith, Burdett and Holmes held the election during the remainder of the day, Murphy returning and acting with them about one hour before the polls closed. After the polls closed, one Samuel B. Scott was sworn in as inspector of election, and Hanford, Murphy, Holmes, Smith, Burdett and Scott proceeded to canvass the votes, and were all engaged for a time in canvassing the city box.   Burdett and Smith took the state box to another table, about three feet distant, and proceeded to canvass it there.   The certificate was signed by Burdett, Holmes, Hanford and Murphy.

It is not very material to inquire whether Hanford, Murphy and Holmes were legally or illegally appointed inspectors.   If there were vacancies in the office of inspector, it was the duty of the supervisor, town clerk and justices to supply such vacancies by appointments, and the persons so appointed will be inspectors of election for the district.   (*Election Law, Title* 3, § 22, *above cited.*) If their appointment was legal, the inspectors elected ceased to be

The People *against* Cook.

inspectors.   (§ 22 *above-cited; People* v. *Stevens*, 5 *Hill*, 620; *People* v. *Jones*, 17 *Wendell*, 83.)   If it was not on its face legal, they were not inspectors.   Admitting that they were inspectors *de facto*, and not *de jure*, so that the officers of the elected inspectors were not vacated, the difficulty still recurs that the appointed inspectors continued to act after the board was full by the appearance of the elected inspectors.   The board consisting in fact of sometimes four, and lastly, during the canvass, of six inspectors.

On the other hand, if the appointment was valid, the elected inspectors ceased to be inspectors, and their acts as such were without color of office, and void.   So that in whatever light we view the proceedings of the election, it is evident it was held by a self constituted board, without color of office, and their proceedings are absolutely void. They were void, too, upon their face.   The certificate of the canvass was signed by four persons claiming to be inspectors.   That was a greater number than is allowed by law, and could not be valid.

The election in the second district in the town of Chesterfield, Essex county, is equally objectionable with that of the second district of the 14th ward of New York, or the second district of the town of Williamsburgh.   The certificate of the canvass of votes in that district was signed by Seymour Ames, Jehiel Beardsley and Major B. Weston, as inspectors of election.   There was no proof that they were inspectors, or that either of them was an inspector, either elected or appointed, but they acted as such during the day, received the votes and canvassed them, and made the returns.   Jesse Gray, a witness for the plaintiff, testified that he was present between nine and ten o'clock in the morning, when the polls were opened, and was there until they closed.   The persons who signed the return officiated as inspectors all day.   No question was raised by any one as to their right to act.   Nobody claimed to be inspectors that day except these men.   On his cross examination the witness further testified as follows: " The

question as to who were the inspectors was talked of in the morning, before the polls were opened. It was conceded on all sides that Ames was an inspector. Finch said so and others. Some one was sent for Ames, because he was reputed to be an inspector. Ames came and proceeded to organize the board acting as inspectors. He appointed the others." On being reexamined by the plaintiff, the witness testified: "Finch was a whig, and came there to help his whig friends. He was deputy sheriff, and claimed to know that Ames was an elected inspector; *and said he got his information from the town clerk before he came to the election.*"

This is all the evidence that was given as to the official character of the inspectors. It is possible that in a proceeding simply to establish the fact of the official character of Ames, it might have been *prima facie* sufficient, but I think even in that case it is too slight to be allowed. But the proof required in this case, should be something stronger than in the case stated. The county and state canvassers rejected those votes, deciding that the evidence was not sufficient to establish the official character of the inspectors. The supreme court were trying the case with the weight of the decisions of the two boards of canvassers to overcome. Mr. Justice Mason, in his opinion delivered in this case at general term says, "The duties of the inspectors as well as those of the county and state canvassers partake of a two fold character; as some of those duties are judicial and some ministerial. In determining whether certain ballots are intended for a given candidate or not they act in a judicial capacity; while in certifying the returns of the canvass their act is purely ministerial. I think therefore it devolves upon the defendants to impeach this determination by some legitimate evidence, or else it must be allowed to stand as they have determined it."

In this opinion, I fully concur with the learned justice, and I apply the principle to this case. The county and state canvassers acted judicially in rejecting the returns

The People *against* Cook.

from the second district of the 14th ward of New York, and from the 2d district of the town of Chesterfield. It therefore devolved upon the plaintiff to impeach their determination by some legitimate evidence, or else it must be allowed to stand as they have determined it. This the plaintiff has failed to do, and the votes should all be rejected.

Mr. Justice Mason in his opinion says, "While the law regards the acts of officers *de facto* acting under color of legal title valid as regards the public and third persons, it does not go the romantic length of giving sanction in any case to the acts of an officer where there is a plain usurpation of the office without any show of legal title. The law holds the acts of the intruder void, both as regards the public and third persons. (*The People* v. *White*, 24 *Wend.* 520, 526.) The mere claim to be a public officer, and the performance of a single act would not probably constitute an individual an *officer de facto*. There must be some color of an election or appointment or such an exercise of the office and acquiescence on the part of the public as would afford a reasonable presumption of at least a colorable election or appointment. (*Wilcox* v. *Smith*, 5 *Wend.* 234.")

Apply these principles to the case of the Chesterfield election. There was no color of an election or appointment of those inspectors. When the evidence is sifted down, all the proof that really exists in the case amounts to this and no more: " Finch said that the town clerk told him that Ames was an inspector," and upon that statement all the reputation there is in the case rests. It is true that Gay swears that " It was conceded on all sides that Ames was an inspector," but when followed out, it is pretty evident that the universal concession arose from the fact that Finch said so, because the town clerk had told him so; Ames on the evidence manufactured for him is sent out for, comes to the polls, enters upon the discharge of the duties of inspector, appoints the other two, and organizes the board

The People *against* Cook.

So in New York, an inspector acts openly without the slightest pretense of an appointment or election, and in Williamsburgh, the inspectors act either without appointment or election of any kind which is valid, or they act after others are appointed in their places and their offices had become thereby vacated.

I am willing to concede and do admit that the character of an officer may be established by proving that he acts as such, but I do not admit that such character can be established where the whole duties of the office consist in the performance of a single act, or that a performance of such act without objection is any evidence of his title to the office. No authority has been cited, and I apprehend none can be produced going this length. It is true that the acts of an officer *de facto,* whose official duty consists in the performance of a single act, is valid; but to prove him an officer *de facto* there must be some evidence besides the act itself.

There is no authority to show that the statute regulating the organization of the board of inspectors is merely directory. If such is the law it is of no importance whether inspectors are chosen or appointed or not. Any person claiming to be an inspector may organize the board, and the board so organized may conduct the election, and the election so conducted must be valid, and the votes must be allowed in determining the result of the election.

The counsel for the relator cites the case of *The Commissioners of Highways of the town of Carmel* v. *The Judges of the County Court of Putnam County,* 7 *Wendell,* 264, and *Orvis* v. *Thompson,* 1 *John. R.* 501, as authority proving that too great a number of inspectors will not vitiate the election.

It is difficult to perceive what bearing these cases have upon the question involved. The case in Wendell merely decides, that where the statute provides that the commissioners of highways, shall not lay out a highway unless it is certified to be necessary by twelve freeholders, the cer-

The People *against* Cook.

tificate is not rendered invalid by reason of its being signed by *more* than twelve freeholders; that in such case the greater number includes the less. ·

In the latter case a tavern license was made, when the supervisor and eight justices were present, a majority of whom signed the license, but the supervisor did not sign it. The court held that the supervisor might in his discretion associate more than two justices with him to form a board of excise; that the number was not limited by the act to three and no more, and that if a majority of the commissioners of excise signed it, it was sufficient, as the signature of the supervisor was not indispensable.

These are all the authorities cited or relied upon by the responden'ts counsel to sustain that point, and it seems to me that no argument is necessary to show that these authorities are too remote to have the slightest influence upon the questions. If they prove any thing they prove quite too much; for if one inspector beyond the number authorized by statute can be added, the number might be increased so as to include every elector in the district.

But it is said that the relator who is innocent as to all the irregularities complained of ought not to be deprived of his office or suffer for the errors or faults of the inspectors. I answer this by the remark, that this question involves a principle of public policy, and the individual right is subordinate to the public good. The legislature has prescribed certain rules and regulations to ascertain and determine the will of the people. These rules and regulations should be followed strictly, or we fall into wild chaos without any certain guide or landmark. The objection too is quite too comprehensive. If the candidate is to be protected in his rights, notwithstanding the errors and irregularities of the inspectors, and the election is to be held valid if honestly conducted, why should it not be where it is fraudulently conducted unless the candidate himself is guilty of the fraud? Nay more; why should he not be protected against casualties and accidents? Some dallying voter has been

Sel. IV.—14

prevented by accident from attending the polls: he intended to vote for the relator, but did not reach the polls in season; you must allow his vote because the candidate should not suffer for a matter that did not arise from his fault. This objection is not sound, and ought not to have any weight in disposing of this cause.

In conclusion, on this subject I fear the consequences of loosening the guards and barriers thrown around the ballot box which must be implied by tolerating the irregularities complained of. The individual rights of the candidates are of no importance in comparison with the necessity of a strict and rigid construction of the requirements of the election laws. The courts have already gone quite too far in holding omissions of acts required by this statute as unimportant; and they should not farther relax the statutory provisions.

I do not propose to examine the other questions in this case. I think some of the facts should have been submitted to the jury, but so far as regards the votes given for Benjamin C. Welch and Benjamin Welch, the judge decided as the jury should have found, and I am not disposed to send the case back on that question; and in addition to that conclusion the questions I have examined are decisive of the case. If I am right as to these questions, the judgment should be reversed. As a majority of the court have come to a different conclusion, it is unnecessary to inquire whether, in case the judgment should be reversed, the defendant should be restored to the office from which he has been ousted by the judgment.

RUGGLES, Ch. J., GARDINER, JEWETT, MASON and MORSE, JJ., concurred in the opinion of judge Willard.

JOHNSON, J., did not hear the argument.

Judgment affirmed.