## New York Marine Court.

*Special Term—February* 17, 1877.

## JOHN STUBER *against* ANTON SCHUARTZ, SUED BY THE NAME OF AUGUST SCHUARTZ.

A defendant arrested by an erroneous name is not necessarily entitled to have the order set aside for the misnomer. The reasons stated. Power to amend in such a case.

McADAM, J.—The plaintiff procured an order of arrest against the defendant, under the name of August Schuartz, in an action for a malicious libel upon the character of the plaintiff, and his patent process of making beer. The libel was published by the defendant in a newspaper called *The American Brewer*, printed in the German language.

The defendant now moves to set aside the service of the summons, complaint and order of arrest, upon the ground that the service was made upon Anton Schuartz, a person not named or described as defendant in the action. It is conceded that the person served with process and arrested under the order was the person intended to be described as defendant. This being so, the maxim *Nil facit error nominis cum de corpore constat* applies. The rule is settled that the misnomer of the defendant in the summons will not authorize a motion to set it aside, the remedy being by plea in abatement (Miller *v.* Stettiner, 7 *Bosw.* 692 ; 22 *How. Pr.* 518 ; Traver *v.* Eighth Ave. R. R. Co., 3 *Trans. App.* 203 ; 6 *Abb. N. S.* 46 ; and see 6 *Rob.* 470 ; 45 *Barb.* 10 ; 20 *N. Y.* 362). This disposes of the motion to set aside the service of the summons and complaint, adversely to the defendant.

The question raised as to the order of arrest will require more consideration. In regard to the alleged

misnomer, it may be said, that in our utilitarian age, errors and mistakes in matters of form and even of substance may be cured by amendment if presented in due time, and the party proceeded against is not materially prejudiced by the amendment sought to be made.   Section 176 of the Code provides that "the court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings, which shall not affect the substantial rights of the adverse party ; and that no judgment shall be reversed or affected by reason of such error or defect."

Section 173 of the Code provides that "the court may, before or after judgment, in furtherance of justice, and on such terms as may be proper, amend *any pleading, process, or proceeding,* by adding or striking out the name of any party, *or by correcting a mistake in the name of a party,* or a mistake in any other respect." Under these liberal provisions of the Code the courts have exercised an almost unlimited power of amendment before trial (see notes to section 173 of the Code), and there can be but little doubt of the power to amend the summons, complaint, and order of arrest herein, by striking therefrom the inexact name of " August" and inserting in lieu thereof the true one— " Anton."

The defendant's counsel has called my attention to cases in which he claims that the existence of this power of amending an order of arrest has been denied (Miller v. Foley, 28 *Barb.* 630 ; Griswold v. Sedgwick, 6 *Cow.* 456 ; Scott v. Ely, 4 *Wend.* 555 ; Meade v. Haws, 7 *Cow.* 332 ; Holley v. Mix, 3 *Wend.* 350 ; Gurnsey v. Lowell, 9 *Id.* 319). These cases will be considered in order.   In Miller v. Foley (*supra*), it was held that where a warrant, issued by a justice of the peace, recited a complaint against *John R.* Miller, for a felony, and commanded the officer to arrest " the said *William* Miller," it afforded no justification to

the officer for the arrest of *John R.*, although it was proved that he was the person intended. The process in that case was by criminal warrant for a felony committed by *John R.* Miller, and for this crime of "John R." the officer was commanded to arrest *William* Miller. The court properly held that the warrant furnished no justification to the officer. The question of misnomer, it will be observed, did not arise in a civil action between the parties to the record, who might have availed themselves of the statute of jeofails and of the liberal provisions of the Code in regard to amendments, but arose on a criminal warrant between the party arrested and the officer. No amendment was allowable by law in such a case or under such circumstances, and hence the officer had only the unamendable warrant to fall back on for protection, and it furnished no justification under the authorities. The present is a civil action, the proper parties are before the court, it has complete jurisdiction over them, and the sections of the Code before cited have full application to their action so far as the error in name is concerned, and it is amendable by force of their provisions. The cases cited in the opinion in 28 *Barbour*, *supra*, were all of them cases of criminal arrest, and arose between the party arrested and the officer making the arrest. The officer, when sued, justifies under his process, and if sued by *John* Jones for unlawful arrest, a warrant for the apprehension of *Samuel* Jones would not on its face justify the arrest of "John." In the action against the officer, there is no power of amendment *nunc pro tunc* or otherwise, and the officer is not permitted *aliunde* to prove that the warrant was intended for some one not named in it; or otherwise the writ in the hands of an ignorant or perverse officer might be made the means of oppressing innocent people whom the magistrate had no intention of imprisoning. It might be considered as

clothing a purely ministerial officer with magisterial powers which the law never intended.   The officer who, in such a case, arrests a person not named in the writ is defenseless to an action by the injured party for the wrong—the warrant, while useful in mitigating the damages, furnishing no defense.

Griswold *v.* Sedgwick (6 *Cow.* 456, *supra*) was an action against an officer, who, on a warrant against *Samuel D.* Griswold, arrested *Daniel S.* Griswold, and this case is not (for the reasons suggested in reference to the former one) an authority sustaining the position claimed by the defendant herein.

Scott *v.* Ely (4 *Wend.* 555, *supra*) was an action against an officer, and it was there held that a misnomer in the warrant of the person arrested subjects the actors to an action for false imprisonment.

Meade *v.* Haws (7 *Cow.* 332, *supra*) was an action of trespass for false imprisonment, and the court reiterated the rule laid down in the preceding cases, that the arrest of a person by the wrong name cannot be justified by the officer, unless it be shown that the party arrested was known as well by the one name as the other.

The other cases cited were of a similar character, and reaffirm the same views.

The distinction heretofore pointed out is illustrated by the rule laid down in two cases, one of which was referred to before (Griswold *v.* Sedgwick, 6 *Cow.* 456).   In this case it was held that although the officer had no right to arrest *Daniel S.* Gregory upon a warrant issued against *Samuel S.* Griswold, that the rule would have been otherwise, in the case of an execution against one by a wrong name, *who appears in the suit, and omits to plead the misnomer in abatement.*   In Farnham *v.* Hildreth (32 *Barb.* 277), the supreme court, after holding that a judgment and execution against *Freeman* Hildreth, will not authorize a sale of the property of *Truman* Hildreth, although the latter may

be the individual intended, decided that where a defendant, sued by a wrong name, *fails* to appear in the action, he does not waive his right to object to the misnomer, after judgment and execution ; but concedes that he would have waived the objection if he had appeared and not raised it by plea.

In Crawford *v.* Satchwell (2 *Strange*, 1218) it was held that if the defendant omits to plead a misnomer, he may be taken in execution by the wrong name. This has been the recognized law for over one hundred years, with the single exception that the defendant's failure to appear in the action does not amount to a waiver of the right to object to the misnomer after judgment.

In the present case the defendant has appeared, and has not yet interposed any formal plea in the action, and the question is raised upon mere motion. The misnomer is not fatal. The error falls within the remedial provisions of the Code, before referred to, respecting amendments, and may be corrected thereunder. The defendant also cites Sanchez de Agreda *v.* Capt. Faulberg (3 *E. D. Smith*, 178) as an authority pertinent to the question under consideration. I have not discovered its applicability.

It is a decision respecting the power possessed by the marine court in 1854, upon warrants of arrest issued under the laws. of 1813. The case under consideration is not founded under that act, but under the liberal provisions of the Code. Those provisions had no application to the warrant issued under the act of 1813, and the common pleas so decided. They have everything to do, however, with the "order of arrest" issued herein by express statute, under the provisions of the Code itself.

In the case of Steinberg *v.* Worms, a motion, similar to the present, was made in the New York superior court, and Chief Justice MONELL filed the following opinion :

"MONELL, Ch. J.—I am satisfied that the person arrested in this action is the person who, it is alleged, made the false representations and purchased the goods ; and he has not succeeded, on this motion, in satisfying me that he ever disclosed to the plaintiff that he was purchasing for his son. The goods were, therefore, sold to him by and in the name of Julius Worms.

"The misnomer of the defendant is of no importance if the right party is served, and the title of the action can be amended if necessary.

"Being satisfied that the person arrested is the proper party, and that the fraud as against him is sufficiently established, I cannot discharge the order of arrest, merely because he is prosecuted by a wrong name.

"Motion denied, with costs."

This authority is in point, and I have inserted the opinion in full because I have not been able to find it reported. I have therefore concluded to vacate the order of arrest herein, unless within three days the plaintiff amends the summons, complaint and order of arrest nunc pro tunc, by the insertion therein of the name of "Anton" instead of "August" Schuartz. Upon making this amendment the motion to vacate the arrest will be denied. No costs allowed to either party on this motion.

The provision of the former Code was that when the plaintiff is ignorant of the name of the defendant, such defendant may be designated in any pleading or proceeding by any name; and when his true name shall be discovered, the pleading or proceeding may be amended accordingly.

The statute revision commissioners, in their desire to meet every objection, sound or unsound, which has been raised against the statutes embodied in their draft, observed that in one case an acute and technical judge, by way of dictum, said that an attachment might be vacated, because the initial only of the first name of the defendant was used (Frank v. Levie, 5 Robt. 600). They accordingly modified

Stuber v. Schuartz.

the statute in two respects. They extended it to the case where a part of the name is unknown; and allowed a fictitious name to be used when the whole name is unknown; and where a part is known they allowed that part, with an identifying description, to be used.

The object of process is to inform the party on whom it is served, or for whose eye it is published, that it relates to him. A summons published in the papers addressed to —— Smith is a very inadequate notice. If the whole name of a known person is unknown, a fictitious name may be used, otherwise there would be a denial of process; but if the surname is known, the statute requires such a description as may aid the defendant to know that he is intended.

If he bears any relation to a party fully named, he may be identified by stating that relation; if he bears any relation to the property which is the subject of the action, he may be identified by that—as, for instance, "the occupant of premises" designated. Any designation within the pleader's power, which affords reasonable means of identification, is enough. This is according to the English practice. In one case, where a babe was a necessary party, the father and mother refused to have her baptized, in order to embarrass the issue of process against her. In that case, the form of description approved by the vice-chancellor, Sir JOHN LEACH, was to designate her on the subpœna as "the youngest female child of her father and mother." In one case, in this State, the owner of a seine in the Hudson river sued the skipper of a sloop for running over his net, and HARRIS, J., said that the designation of defendant as "the man in command of the sloop Hornet" would be good (4 How. Pr. 97).

"Description" in the statute is not to be taken in the popular sense, but in the legal sense—not a word picture of personal appearance, but an identifying phrase.—Daily Register, March 16, 1878.

The question, "What's in a name?" is sometimes asked. Youthful parties, when called upon, for the first time, to give suitable designations to small but active pieces of humanity, are often at a loss what to say. To the propounders of the above query, and to those who have the weighty duty referred to placed upon them, I especially dedicate this article as a dog-days' meditation.

The law supposes every one to be designated and known by two names, one enjoyed by him in common with the other members of his family, be it Jones, Smith or Robinson; the other his exclusive property, and given him at his baptism, be it Tom, Dick or Harry (Frank v. Leir, 5 Robt. [N. Y.] 599). The days when it was sufficient for a man to be called Husy, Busy, or Moses, have been left behind in the onward march of time: and, on the other hand, the exertions of the

Stuber *v*. Schuartz.

Puritans in bestowing such names upon their children as " Job-rackt-out-of-the-asshes," and " If-God-had-not-died-for-thee-thou-wouldst-have-been-damned Dobson," and of the lordly aristocrats of the old world, in decorating their hopeful scions, at their baptisms, with such word chains as " John George Henry Douglas Sutherland Campbell," would be entirely thrown away were the infants laden with such appellations-grievous-to-be-borne residents within the empire shaded by the star-spangled banner; for the law, as administered in America, panders not to the pride of those who would thus stigmatize their children, but, with Republican simplicity, knows of one, and only one, Christian name; it treats the insertion or omission of a middle name with the same indifference that a Liberian mammoth would a fly crawling upon its pachydermatous hide (Edmondson *v*. State, 17' *Ala*. 179; Thompson *v*. Lee, 12 *Ill*. 242; Hendershott *v*. Thompson, 1 *Morr*. [*Iowa*] 186; State *v*. Martin, 10 *Mo*. 391; Hart *v*. Lindsay, 17 *N. H.* 235; Kings *v*. Hutchins, 28 *Id*. 561; Delts *v*. Kinney, 15 *N. J. L*. 130; Allen *v*. Taylor, 26 *Vt*. 599). If inserted in the most formal document, the law rejects it as surplusage (Choen *v*. State, 52 *Ind*. 347); and with supreme unconcern suffers a woman called in a deed Margaret A. Gettings, to subscribe her name as Margaret S. Gettings (Erskine *v*. Davis, 25 *Ill*. 251).

It will be well for godfathers and godmothers, and such like peo-ple, to bear in mind that a name is the word by which a person is to be known or distinguished, and that to be of much use it should be such as will indicate the sex of the owner thereof. This was forcibly impressed upon somebody's mind by the circuit court of the District of Columbia some years ago in this manner: An individual of color held in bondage presented to the court a petition praying to be granted his or her (the gender of the pronoun we should use is unknown to us) freedom. The person who flattered himself that he was the owner of this valuable child of Ham opposed the prayer of the petition on the ground that the petitioner had been lawfully imported under an act of the State of Maryland (chapter .67 of 1796). This statute required that a list of all imports of this kind should be prepared, specifying the sex of each. On the list the colored individual in question figured under the name of " Jo," only this and nothing more. Thereupon the court decided that the list did not properly designate Jo's sex, so that (not knowing more than the judges, we must repeat the name), Jo was entitled to (again we cannot avail ourselves of a pronoun) Jo's freedom (Crawford *v*. Slye, 4 *Cranch C. Ct.* 457).

One would think that the name " Jo " would be the height of brevity, but lawyers learn, from their interesting books, that it has been surpassed; that on one occasion Lord Campbell remarked that

he had been informed, by a person of most credible authority, that within his own knowledge an individual had been baptized by the name of T (Reg. *v.* Dale, 15 *Jur.* 657; 5 *E. L. & E.* 360). What would one expect after T? Surely no name can be shorter ! Yes, indeed ! We read in a book called 6 *Manning, Granger & Scott's Reports,* Mr. Corrie, while arguing learnedly in a case, used these words: "Mr. Unthank says he knows a person who was christened I " (Kinnersley *v.* Knott).

While thus we have it on good authority that I and T have been used as *bona fide* Christian names, we are told, on the other hand, that W certainly cannot be a name of baptism (Nash *v.* Calder, 5 *M., G. & S.* 177). Mr. William Henry W. Calder was the gentleman who drew forth this decision from the court.

Severe has been the conflict waged over the question of the legality or illegality of these one-letter names. Equal justice has not been meted out to all the alphabet alike; favors have been showered on some letters that have been denied to others; A and its associates have been assigned posts of honor, from which B and his clan have by many been excluded, and the dignity of forming Christian names by themselves has been conceded to the vowels by all, while many have refused that distinction to the more numerous but the less-able-to-assist-themselves consonants.

In an English case it was decided that a vowel, which (as the court said) is in itself a word, and may be pronounced by itself, may be a name, though a consonant, which is incapable of being sounded without the addition of a vowel, cannot (Lomax *v.* Tandels, 6 *M., G. & S.* 577). This decision arose out of a discussion over the name of Mr. I. Shakespeare Williams. Judge COLTMAN said that "I" might be a Christian name; while MAULE, J., remarked that he thought they were at liberty to assume that the man's true Christian name was "I. Shakespeare."

In a subsequent case, however, Lord CAMPBELL, when an objection was made to a recognizance taken before Lee B. Townshend, Esq., and I. H. Harper, Esq., that only the initials of the Christian names of the justices were mentioned, remarked: "I do not know that these are initials; I do not know that they (the justices) were not baptized with those names, and I must say that I cannot acquiesce in the distinction that was made in Lomax *v.* Tandels, that a vowel may be a name but a consonant cannot. I allow that a vowel may be a Christian name, and why may not a consonant ? Why might not the parents, for a reason good or bad, say that their child should be baptized by the name of B, C, D, F, or H? I am just informed by a person of most credible authority, that within his own knowledge a

Stuber *v.* Schuartz.

person has been baptized by the name of T'." And in this opinion of the chief, Justices PATTERSON, WIGHTMAN and ERLE concurred (Reg. *v.* Dale, 15 *Jur.* 657; 5 *E. L. & E.* 360).

The point was discussed with considerable learning and humor in the case of Kinnersley *v.* Knott (7 *C. B.* 980). There Mr. Sergeant Talfourd contended earnestly that a defendant called "John M. Knott" was not legally and properly designated, saying that the letter M, standing by itself, could not be pronounced, and meant nothing, but that in this connection it meant something, and that that something ought to be stated, for the law forbade the use of initials in pleadings. He asked the court if they would not most assuredly hold a pleading to be bad if a man of the name of John Robbins was described by the name of "John" and the figures of a couple of red-breasts? (The court did not deign to answer the query.) The learned sergeant insisted that the declaration in question should be held bad because it either put a sign for one of the defendant's names, or described it by the initial letter. A consonant, he urged, by itself, is a mere sound without meaning; the letter H, indeed, by the custom of London and some other places, had no sound at all, though elsewhere it often protruded itself on all occasions; but Mr. Robinson, in reply, admitted that every Englishman had a right to be called by every name given him at his baptism (here Mr. Justice MAULE remarked that he once knew a sheriff named John Wanly Sawbridge Erle Drax), but in this case he submitted it was not shown that the right had been invaded. He said he knew of a bank director christened Edmond R. Robinson; that even if letters did not stand for names in England, Jews, Turks or heathens might use such short names. How, he asked, are such designations as M'Donald, M'Taggart, D'Harcourt, D'Horsey to be set out in pleadings? But the court was against admitting M to be a name. Justice MAULE remarked that vowels might be names, and that in Sully's *Memoirs* a Monsieur D'O is spoken of; but that consonants could not be so alone, as they require in pronunciation the aid of vowels; and the chief justice said that the courts had decided that they would not assume that a consonant expresses a name, but that it stood for an initial only, and that the insertion of an initial instead of a name was a ground of demurrer. (This last point is now varied by statute.) —*Pittsburgh Law Journal,* August, 1876.

So much for the view taken in England concerning the poor consonants. They have had warm advocates on this side of the water. In Tweedy *v.* Jarvis (27 *Conn.* 62), the defendant pleaded in abatement the non-joinder of Mr. Hickock. The plaintiff replied that the plea was insufficient, as the Christian name of that individual was not

given, but he was designated as J. W. Hickock only. In deciding this knotty point, STORRS, Ch. J., discussed the question elaborately. We will quote some of his words: "While it is well settled," he remarked, "in the books, that a letter of the alphabet, which is a vowel, may be the name of a person, there is a contrariety in the cases on the question whether one of those letters, which is a consonant, can constitute a name, for the reason that a consonant, unlike a vowel (which is a simple and perfect sound by itself), is a letter which cannot be sounded, or can, at most, but be imperfectly sounded by itself, and represents only a compound sound, the expression of which by the voice requires its connection with a vowel; and, therefore, that a consonant, not being able to be pronounced by force of its own character, so to speak, must be spelled out in writing by its being conjoined with a vowel, in order that a perfect sound may be produced. It is said that A, being a perfect and simple sound, may be a name, but that B, being a consonant, and producing no sound, unless it be spelled with a vowel which shall represent, and in the pronunciation of the two conjointly produce, some sound, cannot (Miller *v.* Hoy, 2 *Ex.* 14: Nash *v.* Calder, *supra;* Reg. *v.* Dale, *supra*). If we should adopt the distinction made in some of these cases between a vowel and a consonant, and should further be of the opinion that the letter J, by which the Christian name of Mr. Hickock is designated, is to be deemed a consonant, the result would of course be that that letter could not constitute any name, and therefore that the plea is defective. Whether, however, that letter should, as used in the plea, be considered a vowel or a consonant, might still give rise to debate, as that letter is only another form of I, which we are told by lexicographers is, in England, both a vowel and a consonant. We should, however, probably have no difficulty in pronouncing it to be a consonant, as it is only when used as such that I is changed to that particular form. But as applicable to the present subject we see no sensible or rational ground for any distinction between a vowel and a consonant, and think that either of them may be a name, and that name is denoted by the sound by which it is called or pronounced when it is spoken or uttered audibly as a letter. 'Letters,' as said by Judge EVANS (5 *Rich.* 328), 'are the representatives of sounds,' and with him we are wholly unable to see any reason why a simple sound may be represented by a letter, but a compound sound may not. The one conveys as clear an idea to the mind as the other. According to the common mode of speech, a consonant, when it is used alone, standing by itself, is pronounced by the name of the letter, unless it is used as standing for some other word, and when it

Stuber *v.* Schuartz.

is used to designate a particular·person, as it frequently is, the name of the letter is given to him."

In Pierce's interesting memoir of Charles Sumner, we are told that in that illustrious statesman's first case, the defense of one Alissandro Gherardin, one of the chief points was that the surname ended with an *n*, instead of an *r*, as written in the indictment.

We are informed by Mr. V. C. MALINS, that *Thomas* and *Tom* are only different forms of the same name (*L. R.* 7 *Ch. D.* 198). As long ago as the days of Guy Fawkes, it was decided that *Piers* and *Peter*, *Saunders* and *Alexander*, *Jane* and *Joan*, *Jean* and *John*, *Garret*, *Gerat* and *Gerrald*, are the same names, but *Ralph* and *Randall*, *Randulphus* and *Randolphus*, *Sibel* and *Isabella* are distinct (2 *Roll. Abr.* 155). In Illinois, *May* and *Mary* are held to be different names (Kennedy *v.* Merriam, 70 *Ill.* 228). So are *Bart* and *Bartholomew·* (29 *Ill.* 508), and *Henry* and *Harry* (21 *Id.* 535).

If a man writes the letters "Jr." after his name, they are not considered as forming any part of it (Headly *v.* Shaw, 39 *Ill.* 356; State *v.* Grant, 21 *Me.* 171; State *v.* Weare, 38 *N. H.* 314; People *v.* Cook, 14 *Barb.* 259). But where two persons possess the same name, when the name is used it will be presumed that the elder one is the one meant; but of course the presumption may be rebutted by evidence that it was intended otherwise (Bate *v.* Burr, 4 *Harr.* [*Del.*] 130; Brown *v.* Benight, 3 *Blackf.* [*Ind.*] 39).

Every one must have two names, one that of his family, the other his baptismal one. Old Bacon says that it is repugnant to the rules of the Christian religion that there should be a Christian without a name of baptism (4 *Bacon's Abr.* 752). If either name is unknown, the law allows one to be designated by two fictitious cognomens in legal proceedings in the State of New York (Frank *v.* Levie, 5 *Robt.* [*N. Y.*] 599).

In the good old days of yore, though a person could not have two Christian names at one and the same time, that is, could not be called John or James, yet he could, according to the rules of the Church of England, receive one name at his baptism, and another when he was confirmed; for no one was forced to abide by the name given him by his godfather and godmother, when he came himself to make a public profession of his religion. But he did not by taking the new name lose the old one (4 *Bacon's Abr.* 753).

On one occasion a man sued as "Jonathan otherwise John," demurred to being so called, but Lord ELLENBOROUGH refused to inter fere, as he said that for all that appeared to him, "Jonathan otherwise John," might be all one Christian name, and he would not intend that it was not; that names as fanciful as "otherwise" fre-

quently occurred (Scott *v.* Soans, 3 *East,* 111). The courts will not suppose that "Mr." before a man's name is his Christian name, although Mr. Hugh Hitt once tried hard to persuade them to do so (Gatty *v.* Field, 9 *Ad. & E. N. S.* 631).

Men generally assume and keep the name of their parents (women get rid of it as soon as possible); but doing so is purely optional, and a matter of civility to the authors of their being. Family names are not copyrighted, nor are they trademarks which a person can be punished for infringing. Old Jones's son is not bound to continue to be a Jones all the days of his life, nor can anything be done to him if he takes to himself the name of Smith or Robinson, and any contract or obligation entered into by or with young Smith or Robinson (*nee* Jones), in his newly-acquired name, or any grant or devise to him, is as binding and effectual to all intents and purposes, anything supposed to the contrary notwithstanding, as if in the contract, obligation, deed or devise, he had been called by the name of his *pater-familias.* The court said this when Mr. Snook applied for leave to change his patronymic (why Mr. S. should have been dissatisfied with his surname we cannot see; it is uncommon, good old Saxon, and merely a contraction for the dignified name of Seven Oaks, a town in Kent, England). Under the New York law (c. 464 of 1847), a judge of the court of common pleas may authorize a change of name when he is satisfied that the applicant for the change will derive thereby a pecuniary benefit; the mere possibility or probability of such a benefit accruing is not sufficient; it must be as clear as daylight to the judge that such benefit will result (Petition of Snook, 2 *Hilt.* [*N. Y.*] 566).

In England, as Lord Chief Justice TINDAL laid down (Danes *v.* Lowndes, 1 *Bing. N. C.* 618), there is no necessity for any application for a royal sign-manual to change a name. Although that is a mode which persons often have recourse to because it gives a greater sanction to it and makes it more notorious, still a man may, if he pleases, and it is not for any fraudulent purpose, take another name and work his way in the world with his new name as well as he can. Nor is there any necessity for any legal steps whatever.

As a final remark we would say that some names, although differing to the eye, are considered, for all practical purposes, the same, being, to the ears of the judge deciding the matter, identical in sound; for instance, Chambles and Chambless, Ward *v.* State (28 *Ala.* 53); Conly and Conolly, Fletcher *v.* Conly (2 *Greene'* [*Iowa*], 88); Usrey and Userry, Gresham *v.* Walker (10 *Ala.* 370); Rae and Wray, Vance *v.* Wray (3 *U. C. L. J.* 69). But the auricular appendages of learned occupants of the bench have discovered a difference in the sound-waves produced by pronouncing the words, Comyns and Cummins,

Cruickshank *v.* Comyns (24 *Ill.* 602); Jeffery and Jeffries, Marshall *v.* Jeffries (1 *Humph.* 299); Jacques and Jakes, Jaques *v.* Nichols (*T. T.* 3 & 4 *Vict.* [*Ont.*]); and Owen and Orrin, Ferry *v.* Mathews (*T. T.* 5 & 6 *Id.*), and so have held them not to be identical.—*Albany Law Journal*, vol. 18, p. 126.

By a name in law must be understood the full Christian name, as received in baptism, prefixed to the surname received from the parent ancestor. Initials or middle names are not recognized (Petition of John Snook, 2 *Hilt.* 566; People *v.* Cook, 14 *Barb.* 259; 8 *N. Y.* 67; 39 *Barb.* 479; 5 *Robt.* 640).

This is the rule in New York. In Massachusetts, however, the middle name is regarded (see 2 *Mass. Law Rep.* No. 6).

Upon the subject of names generally, see also 7 *American Law Record*, 665; 18 *Alb. L. J.* 505.