Woodruff *v.* McGuire.

---

## New York Marine Court.

*General Term—November*, 1880.

## ALBERT G. WOODRUFF *against* DANIEL McGUIRE.

Where a debtor, who is arrested under an irregular execution, enters into a stipulation with the creditor that the execution be set aside, this is not such a consent on the part of the creditor to let the debtor go as to operate as a satisfaction of the judgment.

This was an appeal from an order at special term, directing that the judgment herein be marked satisfied

of record, and the defendant's sureties released from all liability.

The facts were, plaintiffs had a judgment against defendant, against whom an order of arrest had been granted in the action. Defendant had been a resident of New York city. Pending the action he removed to Brooklyn. Execution was issued against his property to the sheriff of New York county. None was issued to Kings county, the plaintiffs being ignorant of his change of residence. Execution was then issued against his body to the New York county sheriff, under which he was arrested. Thereupon he claimed, through his attorney, that his arrest was irregular, and that the execution could be set aside under section 1489 of the Code. He, however, filed a petition under the Fourteen Day Act to obtain his discharge from imprisonment. In those proceedings, plaintiffs appeared and made objections. Defendant was allowed to amend. An order for his discharge was granted, which, however, the sheriff refused to recognize as valid. Thereupon a stipulation was entered into between the parties to the suit and the sureties, that the order of discharge be vacated, the Fourteen Day Act proceedings discontinued, the body execution set aside, defendant not to sue for false imprisonment, plaintiffs not to issue another execution for a year. On that stipulation an order was entered.

Thereafter, defendant and the sureties, claiming that this stipulation was virtually a consent that an imprisoned debtor might go free, and under the authorities operated as a satisfaction of the judgment, made a motion to have the judgment marked satisfied of record, and the sureties discharged of all liability and their bond canceled. Their motion was granted. Plaintiffs appealed.

*John Brooks Leavitt,* for the appellant.

*Geo. G. Dickson,* with *Beach & Brown,* for the respondent.

McADAM, J.—The order made in the Fourteen Day Act proceedings discharged the defendant from imprisonment, but left the creditor free to pursue all the ordinary remedies upon his judgment (3 *R. S.* 6 ed. p. 26, § 12). This was the legal status of the parties when the consent was given, providing : 1. That the order made in said proceedings be vacated, and the proceeding itself discontinued ; 2. That the execution issued against the defendant's person be set aside. The judge below held that the legal effect of this consent not only accomplished that which the original order for discharge contemplated, but goes to the extent of satisfying the judgment itself, a result which, under the statute cited, did not follow the discharge. The legal effect of this consent on the relative rights of the parties is, therefore, the question presented by this appeal, and will be at once considered.

The defendant did not rest upon his discharge, the sheriff having refused to respect it, urging grounds against its validity. The discharge had been opposed by the plaintiff, and although his objections were overruled, his right of appeal remained, and if the objections went to the jurisdiction of the officer the sheriff might have been liable to an action for an escape if he had acted on the order.

At all events, the defendant did not regard his position as impregnable. The plaintiff had like fears about the regularity of the execution under which the defendant was held.

The defendant's attorney had claimed that the irregularity existed, and the appeal book shows that the fact was as claimed. If the sheriff's objections respecting the discharge were ascertained to be well founded, or if the order for discharge had been reversed on ap-

peal, the defendant, having received no benefit from the order, might have been relegated back to the attack upon the regularity of the execution, which course would have been open to him with every assurance of success. Acting upon these fears, the consent was given, the discharge was vacated, the proceeding itself was abandoned, and the execution was set aside.

The fact that no execution against the property of the defendant was issued to and returned by the sheriff of the proper county, clearly appears in the appeal book. That the defendant knew of and claimed that this irregularity existed also appears, and by this claim the plaintiff was evidently kept *in terrorem*. There was no such waiver of the right to attack the execution as left the plaintiff free from peril. A void or voidable discharge, or an order setting it aside, would not have precluded the defendant from attacking the execution on account of its infirmity. It was open to an incurable objection, and success would have attended any attack upon it. Such being the case, the plaintiff, under the authority of Rowe v. Guilleaume (15 *Hun*, 452), had the right to consent to do that which the court would have done without his consent, and this without satisfying or impairing his judgment, or the remedies upon it. In the case cited, the defendant moved to set aside the execution for irregularity. But that circumstance does not render the rule there decided inapplicable here. The defendant in the present case claimed that the irregularity existed, and we have been unable to discover any practical distinction between a case where attention is called to the irregularity orally, and another, where attention is called to the same defect by written notice.

If, in the latter case, the creditor may consent to correct the irregularity without impairing his rights, it is difficult to discover why he may not in the former case do the same thing without producing any different

Woodruff v. McGuire.

result. This conclusion gives effect to the intention of the parties as expressed in their written stipulation; it prevents undue advantage by the one party litigant over another; it preserves the judgment which the defendant's discharge would not have impaired, and places the parties where they expected to be placed when they made the stipulation which has occasioned this appeal.

The fact that the defendant joined in the consent is an indication that he still regarded the objection to the execution so open, and that he considered his right to attack it as unimpaired, and that he therefore united in the request that it be set aside. This, for practical purposes, may be regarded as equivalent to a motion asking the relief he induced his adversary to grant.

If the proper execution against property is issued, and a new execution against the person follows, the defendant may apply for a discharge from imprisonment thereunder according to the statute before referred to, and thus the parties are restored to all their former privileges, without doing violence to the principles of good faith which should characterize every stipulation made in the course of a judicial proceeding. The fact that defendant's sureties may have become embarrassed in litigation, or in liability growing out of this litigation, is matter with which we have nothing to do. We are to deal with the record and the parties to it, leaving outside questions to be met as they legitimately arise.

Upon the grounds stated (and without entering into a discussion of the general rules governing voluntary consents to discharge from imprisonment, which are correctly stated in the opinion of the learned judge*

---

* The special term judge filed the following opinion:

HAWES, J.—The briefs of counsel submitted on the part of both parties in this action cover the whole range of decisions upon the questions involved; but I am inclined to think, after a somewhat care-

below), the order appealed from will be reversed, with costs.

SHERIDAN, J., concurred ; SHEA, Ch. J., dissented.

ful examination of the case, that the issue is a comparatively simple one. The conceded facts in brief show that plaintiff obtained a judgment against defendant, issued execution against his property, and subsequently against his person.

That the defendant raised no question as to the regularity or validity of the execution, but recognized it as valid, and proceeded to obtain his discharge under it by invoking the provisions of the act for the release of insolvent debtors, and in these proceedings the plaintiff joined, and availed himself of all the rights and benefits which could accrue to him by virtue of them. Upon representation on the part of defendant that his family was sick, plaintiff voluntarily and of his own accord consented to the entry of an order vacating the execution issued against the person, and discharging defendant from imprisonment and allowing him to go beyond the jail limits, stipulating, however, to be at liberty to again arrest defendant at the end of a year, with the usual stipulation on part of defendant not to bring an action for false imprisonment. The defendant and his sureties, as well as plaintiff, through his attorneys, who were duly authorized to act in his behalf, joined in the stipulation. At the expiration of the year, and acting apparently under the provisions of this stipulation, another execution was issued by plaintiff to Bernard Reilly, sheriff of the county of New York, against the person of defendant, and he was subsequently surrendered to the sheriff by his bail in exoneration, and the motion is now made upon these facts to set aside the judgment and discharge defendant from custody.

It has long been the well-settled law of this State as well as of England, that if a debtor taken in execution is discharged with the consent of the plaintiff, the judgment is extinguished and the debtor cannot be retaken. This principle of law has been guarded with such jealous care, and is so well established, that it has been maintained even in cases where the plaintiff has been induced to grant such consent by means which the court stamps as " scandalous " (Blackburn v. Streford, 2 East, 243).

So far as the defendant is concerned, the execution against his person is a complete satisfaction of the debt, and the United States supreme court, in Magniac v. Thomson (15 How. U. S. 281), declares that "the taking of a defendant's person under a ca. sa. operates as a satisfaction of the debt, and for that reason deprives the creditor of

Woodruff *v.* McGuire.

all recourse to the lands or property of any description belonging to the debtor." The rule I understand to be different in some of the States, but from the examination of the cases which I have been able to consider, I think that the law as laid down in Magniac *v.* Thomson (*supra*) is the law of this State, subject, of course, to the statutory exceptions. The very right which the statutes confer upon a plaintiff, allowing him to resort to defendant's property in a case where the imprisoned debtor dies or is discharged under the insolvent law, demonstrates, by its exceptional character, that otherwise the general rule prevails, and the imprisonment creates a satisfaction of the debt.

I am aware that some of the decisions are guarded in terms, and speak of the satisfaction of the judgment so long as the imprisonment continues, especially in cases where a decision upon this point was not essential to the decision of the matters before them. But I know of no instance where the rule above set forth has been departed from in this State when the question has been fairly presented. The law, moreover, declares that "a prisoner shall not be allowed to barter away his liberty." "The body of a freeman," says Chief Justice Hobart, "cannot be made subject to distress or imprisonment by consent, but only by judgment; and when the law has duly imprisoned a prisoner and he has been discharged by consent, the covenanting party has no power to rearrest, and the prisoner will not be allowed to consent to such action."

It is the economy of the law, and is supported by every sentiment of equity and fairness, that a creditor having elected this supreme remedy, and taken the body of the debtor, shall be bound by his election, and if he consents to discharge the debtor after such imprisonment he has exhausted all the remedies which the law has given him. In Yates *v.* Van Rensselaer (5 *Johns.* 364), the plaintiff agreed with defendant that he might go beyond the jail liberties on the defendant's consent, under seal, that he would remain in custody of the sheriff, and in case of an escape that he might be retaken and confined under the same *ca. sa.* or a new one. The defendant violated his covenant, and the sheriff retook him and set aside the writ, declaring that the "rule of law upon this point is well settled."

The court, in Cooper *v.* Bigelow (1 *Cow.* 56), says: "The bodies of the defendants, Bigelow and Searles, being in execution, this is, in judgment of law, a satisfaction of the debt."

In Toster *v.* Jackson, the court says that a *capias ad satisfaciendum* as against the party is not only an execution, but a full satisfaction by force and act and judgment of law."

In Ransom *v.* Hayes (9 *Cow.* 138), Judge Woodworth says: "A

discharge of the debtor from arrest on execution by the creditors' consent extinguishes the judgment," and cites a number of cases in support of the doctrine. The later cases support the rule whenever the question is fairly presented. But it is suggested by the counsel for plaintiff that he did not covenant to the discharge, but merely to the entry of an order, and that his discharge was the act of the court; but I know of no more complete or expeditious consent to the discharge of a prisoner than the consent to the entry of an order discharging him, or what is tantamount to it.

Plaintiff's counsel insists, however—and supports his view with marked ability—that the ruling in Rowe v. Guilliame (15 Hun, 462), is decisive in his favor, for the reason that it now appears by evidence taken by plaintiff since these proceedings were instituted, that at the time of issuing the execution against defendant's property—to wit, June 18, 1877—the defendant was a resident of Kings county; and that the execution against the person was therefore irregular, the execution against the property not having been issued to the county where defendant resided. Hence the plaintiff claims that the consent signed by him was merely a consent to do what the court would do of its own motion, and that the ruling in Rowe v. Guilliame is in point. There are a number of objections to this theory. The evidence upon this point is of the most general character, defendant's wife stating in her affidavit, dated February 18, 1880, that "we had lived at 156 York street, Brooklyn, about five years," whereas defendant had sworn on his examination under the Fourteen Day Act proceedings that he resided in Desbrosses street, New York city, and the presumption is certainly in favor of his being a resident of New York city for the purposes of that proceeding. The execution was issued June 18, 1877, and was properly issued to the county of New York at that time, wherever defendant resided, as the amendment to the Code did not take effect till September 1, 1877; and whether it became necessary to issue another execution in Kings county, even on the supposition that defendant resided there, I will not now decide, as, in my view of the case, it is wholly immaterial.

The ruling in Rowe v. Guilliame is based upon an entirely different principle. The defendant having been arrested, noticed a motion to set aside the execution, as no order of arrest had been previously granted, and the case was not one in which ca. sa. could issue without such a prior order. Upon this state of facts the plaintiff, after the service upon him of a notice of motion to set aside the execution, consented to his discharge. In the opinion Judge DANIELS says: "The defendant did not acquiesce in his liability to arrest upon the execution," and denies the motion virtually upon the theory that it was no

Woodruff v. McGuire.

consent on the part of the plaintiff, but "was induced by the hostile acts of defendants."

In other words, the discharge was procured by defendant, and as the defect appeared upon the face of the record, the motion virtually prevailed by operation of law and not by consent. Such seems, at least, to be the theory upon which the decision rests. It may be said that this is a refinement of language. That the act on the part of defendant was not such as to make the consent other than a voluntary one, in the strictest construction of the term. That it would not of necessity follow that the order entered by consent was one which the court would have made, and that, in short, any consent given by plaintiff to a discharge would be no consent if any irregularity should hereafter appear, which the court might determine to be such.

Now, I am frank to admit that the decision in Rowe v. Guilliame comes very near to a modification of the rule in any fair construction of the opinion; yet the facts which apparently controlled the learned judge in that case are so different from those presented in the case at bar as to relieve me from any embarrassment, and prevent any further expression of my views in regard to it.

The defendant in this case took no hostile action in reference to the execution, but, on the contrary, fully acquiesced in it, and proceeded to take advantage of it by entering upon proceedings to obtain his release, in which proceedings the plaintiff participated, and derived all the advantages possible from them. As between the parties, the execution was valid, and for aught that appears, it was valid as between all persons. In any event, its validity has never been questioned—except as it incidentally appears upon this motion. No action was taken by defendant to induce plaintiff to consent to his discharge, and his assent was as complete and voluntary as can well be imagined. Under such circumstances, I know of no good reason why the general rule of law so long settled in this State should not prevail.

The judgment is vacated, defendant discharged from custody, and sureties released, with costs of motion to defendant.

For the general rule governing these cases, see 60 Barb. 338.

# JUDICIAL OATHS AND COMPETENCY OF WITNESSES

### AS AFFECTED BY THEIR WANT OF RELIGIOUS BELIEF.

**No witness to be excluded on that ground.**

The rule, that all witnesses who are examined upon any trial, civil or criminal, must give their evidence under the sanction of an oath, is laid down by some of our earliest writers, and appears to have been of universal application except in the cases in which a solemn affirmation has been allowed by statute to take the place of an oath. A witness, in taking an oath, must be understood to make a formal and solemn appeal to the Supreme Being to witness the truth of the evidence which he is about to give, and further, to invoke divine vengeance on his head, if what he shall say be false. The particular form or ceremony, which is quite distinct from the substance of the oath itself, varies in different countries, and according to different forms of religion. In England and America, the customary form in which an oath is administered to Christians consists in calling upon the witness to declare the truth, the whole truth and nothing but the truth, as he may be helped by God, and requiring him to touch with his right hand and to kiss the Gospels.

The rule of our law, therefore, is, that witnesses may be sworn according to the peculiar ceremonies of their own religion, or in such manner as they consider binding on their consciences. Jews have accordingly been sworn in our courts from a very early period on the Pentateuch, and they take the oath with the head covered. A Mohammedan is sworn on the Koran. The deposition of a Gentoo has been received, who touched with his hand the foot of a Brahman. A Chinese has

been sworn by the ceremony of his breaking a saucer, and declaring that if he did not speak the truth his soul would be cracked like the saucer. Scotch Covenanters and members of the Kirk have been allowed to take the oath, by holding up their hands and kissing the book (1 *Phillips on Ev.* 4 Am. ed. 17). Whatever be the form the meaning of the oath is the same. In People *v.* Cook, a contested election case (14 *Barb.* 309), Mason, P. J., said: "It appears that two challenged voters were sworn in the Second District of the Fourteenth Ward, upon Ollendorff's French Grammar, and in the Western District of the First Ward of the City of New York, three challenged voters were sworn upon Watts' Psalms and Hymns." The court said: The common law doctrine is. that an oath taken in any form to which the affiant assents, and by which he intends to be bound, is, if administered by a competent tribunal, a valid oath (citing *Whart. Am. Crim. Law*, 185; 16 *Pick.* 156; *Roscoe Crim. Ev.* 130, ed. 1846; 6 *Carr. & P.* 571; *Cowen & H. Notes*, 705, n. 494). It is said, however, that our statute (2 *R. S.* 407, § 82) has prescribed the form of administering the oath; and that it requires all persons to be sworn, by laying their hands upon and kissing the Gospels, unless the witness expresses a different desire. It was held, however, in the case of State *v.* Whittenhurst (2 *Hawk*, 458), that any form pointed out by the witness is binding, and he may be indicted for perjury upon it; and they add, "so he may, though he omit to make known his scruples of conscience, and be sworn in the common law form, or any other binding form." They add, "by submitting to be sworn in the common law form, he makes his election, and is estopped to set up his scruples (citing *Cow. & H.* 705). It is also said, in the case of Rex *v.* Brodribb (6 *Carr. & P.* 571), that if the oath be administered as binding, and was so received by the party, it is equally within the statute

against perjury, whether the book on which he was sworn was a Testament or not. The oaths were therefore held valid, and the decision was affirmed by the court of appeals (8 *N. Y.* 67). The court of appeals said (page 84). "The oath, though irregularly administered, was a valid oath. If the party taking it makes no objection to the mode of administering it at the time, he is deemed to have assented to the particular form adopted, and is liable to all the consequences of perjury, as if it had been administered in strict conformity to the statute."

Thus much for the form of the oath and the mode of administering it. Next for its binding effect on the conscience. Under the rule of the common law, atheists and such infidels as did not profess any religion that could bind their consciences to speak the truth, were excluded from being witnesses (*Ib.*). The evidence of Quakers and members of, other sects who refused to take a formal oath in any shape, was for a long time held inadmissible. This disability has now been entirely removed by the Legislature, and Quakers and Moravians are now allowed to give evidence upon their solemn affirmation in all cases, criminal as well as civil. The extent to which the common law rule was carried is illustrated by a brief reference to the authorities.

In the case of Jackson *v.* Gridley (18 *Johns.* 103), it was proved that a person offered as a witness had, within three months before the trial, often, deliberately and publicly declared his disbelief in the existence of a God, and a future state of rewards and punishments ; and the rule adopted by the court was, that all who did not believe in a God, or if they did, did not think that he would either reward or punish them in the world to come, were incompetent witnesses in any case, or under any circumstances, because an oath could not be any tie or obligation upon them. In

a subsequent case (Butts *v.* Suartwood, 2 *Cow.* 431), the plaintiff proved his cause of action by one Piper, who was objected to as incompetent, on the ground of his infidelity. A witness testified that he had heard him frequently declare, "that he did not believe in the Bible more than any other history; and that he would as soon swear by the uplifted hand as upon the book: but he at the same time declared that he believed in the Deity, and in the doctrine of universal salvation, and that he considered some part of the Bible as the word of God." The justice decided that he was a competent witness, and he was sworn and examined accordingly. The supreme court upon appeal, per SUTHERLAND, J., held that "The proper test of a witness's competency on the ground of his religious principles is whether he believes in the existence of a God who will punish him if he swears false. There is no evidence in this case, to show what precise creed is embraced in the doctrine of universal salvation. But I do not understand all those who hold that doctrine to deny all future punishment. Some only deny the duration of those punishments to be eternal. If this is a true exposition of their faith, then the witness comes within the rule. For aught that appears he believed in the existence of a God and a future state of rewards and punishments. He was therefore properly admitted." In People. *v.* Matteson (2 *Cow.* 433, note), WALWORTH, Circuit Judge, held that if the witness believes that he will be punished by his God, even in this world, if he swears falsely, there is a binding tie upon his conscience and he must be sworn; and that the strength or weakness of that tie is only proper to be taken into consideration in deciding upon the degree of credit which is to be given to his testimony; that it is a question as to his credibility and not as to his competency. In a supplementary note published at page 572 of the same book (2 *Cow.*), WILLIAMS, Circuit

Judge, held that under this rule a Universalist was a competent witness.   In Wakefield *v.* Ross (5 *Mas.* 16, 18, 19, note), it appeared that one witness had often declared he did not believe in the existence of a God or a future state ;  another had declared that he did not believe in the latter, had read Tom Paine's works, and did not know whether he (the witness) believed anything.    STORY, J., rejected both as incompetent. The Revised Statutes (see Second Edition, published in 1836, pp. 328, 329, §§ 102–110 ;  Sixth Edition, published 1875, pp. 692, 693, §§ 114–122) contain the following provisions in regard to the administration of oaths and affirmations :

" § 102. The usual mode of administering oaths now practiced, by the person who swears, laying his hand upon and kissing the Gospels, shall be observed in all cases in which an oath may be administered, according to law, except in the cases hereinafter otherwise provided.

" § 103.    Every person who shall desire it, shall be permitted to swear in the following form : ' You do swear in the presence of the everliving God ;' and while so swearing, such person may or may not hold up his hand, in his discretion.

" § 104.    Every person who shall declare that he has conscientious scruples against taking any oath, or swearing in any form, shall be permitted to make his solemn declaration or affirmation in the following form.   ' You do solemnly, sincerely and truly, declare and affirm.'

" § 105. Whenever the court before which any person shall be offered as a witness, shall be satisfied that such person has any peculiar mode. of swearing connected with, or in addition to, the laying of his hand upon the Gospels and kissing the same, which is more solemn and obligatory in the opinion of such person, the court may, in its discretion, adopt such mode of swearing such person.

"§ 106.  Every person believing in any other than the Christian religion shall be sworn according to the peculiar ceremonies of his religion, if there be any such ceremonies, instead of any of the modes herein-before prescribed.

"§ 107.  Every person believing in the existence of a Supreme Being who will punish false swearing, shall be admitted to be sworn, if otherwise competent.

"108.  No person shall be required to declare his belief in the existence of a Supreme Being, or that he will punish false swearing, or his belief or disbelief, of any other matter, as a requisite to his admission to be sworn or to testify in any case.  But the belief or unbelief of every person offered as a witness, may be proved by other and competent testimony.

"§ 109.  But the last section shall not be construed to prevent any court before whom an infant, or a person apparently of weak intellect shall be produced as a witness, from examining such person, to ascertain his capacity, and the extent of his religious and other knowledge ; nor shall it be construed to prevent a court from inquiring of any person what are the peculiar ceremonies observed by him in swearing, which he deems most obligatory.

"§ 110.  In all cases in which an oath or affidavit is required or authorized by law, the same may be taken in any of the forms in this article prescribed, in the several cases hereinbefore specified, and every person swearing, affirming or declaring in any such form, or in any form authorized by law, shall be deemed to have been lawfully sworn, and to be guilty of perjury for corruptly or falsely swearing, affirming or declaring in any such form, in the same manner as if he had sworn by laying his hand upon the Gospels, and kissing the same."*

* These statutory provisions have been superseded by those of similar tenor, slightly varied, which will be found in the Code of Civ. Pro. §§ 845–851.

Notwithstanding the provisions of the statute, as well as of the State constitutions of 1777 and 1821, the courts clung tenaciously to the old English common law rule as to competency, which excluded disbelievers from the witness-stand. The constitutional convention of 1846 evidently determined to alter this rule, by introducing into the fundamental law of the State a provision providing that no person should be rendered incompetent to be a witness on account of his opinions on matters of religious belief. The history of this clause in the convention shows the construction put upon it by the convention itself. Early in the session (June 12) standing committees were appointed, of which a committee "on the rights and privileges of the citizens of this State" was one.

On June 15, Mr. Cornell, a blacksmith of New York, offered the following resolution, which was adopted : "*Resolved*, That it be referred to the committee on the Rights and Privileges of Citizens of this State, to inquire into the expediency of making constitutional provision to secure the practical enjoyment of perfect liberty of conscience, opinion and belief to all persons within the jurisdiction of this State, and to prohibit all political and civil disabilities on account thereof or in connection therewith."

On August 8, the report of this committee was under discussion.

Mr. Cornell moved that the whole of section 6 of the old constitution (being the same as it now stands, but without the witness clause) be stricken out, and the following be inserted in lieu thereof, to wit : " The mind being by nature free, all men have an inherent, inalienable and indefeasible right to the full and free exercise of the faculties thereof, and to form, hold and utter opinions upon all subjects. The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall not be infringed ;

but no man shall be compelled to attend or support any religious worship, place or ministry, of any name, nature or description whatever, except to fulfill a contract to give pecuniary support, voluntarily and freely made ; nor enforced, restrained, molested or burdened in mind, body or goods ; nor otherwise suffer on account or in consequence of any creed, opinion or belief, touching matters of religion, philosophy or other subjects ; nor shall the same in any wise diminish, enlarge or affect his political or civil capacity, competency or duty. But the liberty of conscience, hereby secured to all mankind within this State, shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of this State."

This was negatived, evidently for the reason that it was too lengthy and inappropriately expressed to become a constitutional provision.

Thereupon Mr. Moses Taggart, a distinguished lawyer from Genesee county, moved to insert after the word "mankind" the following: "And no person shall be deprived of any right or provision, or rendered incompetent as a witness, on account of his religious belief or unbelief."

Mr. Taggart explained that his main object was to abolish the law which declared persons holding certain opinions incompetent to be witnesses ; that he desired to see such objections apply to the credibility, not the competency, of the witness ; that this matter had been left to the Legislature for two hundred years, and they had failed to attend to it. After a short discussion this amendment was adopted (*Argus Report*, p. 430).

On October 5 (p. 408), the matter came up for final revision, and the report proceeds: "Mr. Taggart then offered his amendment, to add, after the word 'mankind' the words: 'And no man shall be deprived of

any rights or be rendered incompetent to be a witness on account of his opinions on religious belief.' ''

Mr. Taggart spoke briefly in favor of his amendment.

Mr. George A. Simmons, a lawyer from Essex county, opened the debate. He thought, "A more dangerous idea could not be spread through the State than that a witness was to be tolerated who was a disbeliever in the existence .of a Supreme Being, and his moral government to punish false swearing." He proceeded and stated all of the well-known arguments on that side of the question. "It was unsafe." "All civilized nations had adopted the rule." "It would abolish all oaths, civil as well as judicial," &c. "It was better to leave the matter as it was," or "leave it to the Legislature."

Mr. Arphaxad Loomis, a lawyer of Herkimer county, and Mr. Horatio J. Stow, a lawyer from Erie county, strongly advocated Mr. Taggart's amendment. As lawyers, they referred to cases showing that the old law worked manifest injustice, and was not even a good practical test of credibility ; that to make it a matter of competency, *i. e.*, exclusion, worked an injury not only to the persons excluded, but might to any citizen of the State, or the State itself having need of their testimony, even in cases of life or death. This exclusion was as dangerous as those for color or sex, which had been abolished. They declared the practices under the old law as entirely hostile to liberty of conscience, which was a mockery in this State with the old laws in the books. Their statements were short, but some of them were practical and able.

Mr. Simmons was still unconvinced.

Mr. Taggart replied to the gentleman from Essex, and asked how much less was a man to be believed that honestly avowed his disbelief, than a hypocrite

who assumed this belief to gain credibility? He also referred to the the United States Constitution (art. 6, subd. 3), which provided that there should be no test of religious belief. He said the Chief Judge on the bench may have no religious belief. He may be a perfect infidel, and he is not disqualified; but let him be called as a witness to give testimony in a court, and his unbelief would exclude him. He believed that neither religion nor the religious community longer desired this test. He had never known the question raised during his practice but once, and he trusted he should never see it raised again.. Whether the witness believed in a Supreme Being or had any belief on that subject, if there was anything in this affecting his credibility, let it go to the jury. Let it go to his credit and not to his competency."

Mr. Henry C. Murphy, lawyer from Kings county, moved to amend the amendment by adding as follows: "But evidence may be given as to the belief or disbelief of the witness in the obligation of an oath, and the ground of such belief or disbelief, in order to enable the jury to judge of his credibility." This amendment was negatived by a vote of twelve ayes to ninety-two nays.

The Taggart's amendment was then carried by a vote of ayes sixty-three, nays forty-six. The section containing the witness clause was then adopted, in the following words. "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State to all mankind; *and no person shall be rendered incompetent to be a witness on account of his opinion on matters of religious belief*, but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State" (*Const.* 1846, art. I. § 3).

Since the adoption of this amendment similar provis-

ions have been introduced into the Constitutions of Arkansas, California, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Nevada, Ohio, Oregon, South Carolina, West Virginia, Wisconsin, and into the statute law of Massachusetts and Vermont. The State of Rhode Island adopted a like provision in 1842. That the change made was a radical one is apparent. In a note to Blackstone's Commentaries the editor, describing the prejudice which formerly existed against disbelievers, remarks: "I have known a witness rejected and hissed out of court, who declared that he doubted of the existence of God and a future state." This prejudice has worn away since then, not because religious people indorse the views of free-thinkers and disbelievers, or approve of their doctrines, but for the reason that experience has taught them the danger of excluding in a court of justice the light of truth, even though the conduit through which it comes may be of a character not of their own liking. In view of this fact probably, the British Parliament passed an act providing that: "If any person called to give evidence in any court of justice, whether in a civil or criminal proceeding, shall object to take an oath, such person shall, if the presiding judge is satisfied that the taking of an oath would have no binding effect on his conscience, make the following promise and declaration: 'I solemnly promise and declare that the evidence given by me to the court shall be the truth, the whole truth, and nothing but the truth.'"

This act is headed by this preamble: "Whereas, the discovery of truth in courts of justice has been signally promoted by the removal of restrictions on the admissibility of witnesses, and it is expedient to amend the law of evidence with the object of still further promoting such discovery, be it enacted," &c. The contrast between the incident cited from Black-

stone and the admission made in the above preamble, is quite noticeable. By c. 49, 33 & 34 Victoria, the above act was amended and extended, so as to make the meaning of the words "presiding judge" to be any officer or person having authority to administer an oath (1 *Lloyd's Statutes*, 687).

The next question that arises under this constitutional provision is whether the witness must have what he conscientiously deems religious opinions or what the trial judge regards as proper religious belief of some known kind. The Constitution has apparently left it to every one to determine for himself what the correct religion is, he may, therefore, embrace any that satisfies his conscience, and he is to be no longer excluded from the witness-stand because his views do not harmonize with those of the trial judge. If this were otherwise it would in effect leave to the determination of every trial judge the question whether the witness's belief was a religious one or not, and the judge who took upon his hands such a responsibility would arrogate to himself the determination of the whole question of religion and philosophy, and would soon find his conclusions (no matter how honestly expressed) denied and condemned by others whose opinions upon such a subject might be regarded as more profound and weighty. It is said that atheists base their religious views upon "The Universe as the Supreme Being," and they claim that this places them with the scientists, or, as they are sometimes called, the scientific pantheists of modern times. Their faith and religion, they assert, is the direct continuation of the pantheistic religions and sects of the middle ages, and those of the ancient world, from Greece up to India and Egypt. If the witness appears to be sincere even in this belief, or in any other which he calls his religious opinions, the trial judge cannot consider their soundness or propriety. This conclusion results from

the fact that religion is a subject on which every man has a right to think according to the dictates of his understanding. It is a solemn concern between his conscience and his God, with which no human tribunal has a right to meddle.

The effect of the constitutional amendment of 1846 was considered by the supreme court in the case of Staubio *v.* Hopkins (28 *Barb.* 265), at the Cortland general term. Judge BALCOM, in that case, said: "That instrument (the Constitution) makes all persons competent witnesses, whether they be infidels or atheists, or believe they are like the beasts that perish." Judge CAMPBELL said: "It was intended that the question of competency should be settled. No testimony would be allowed on the question of competency, that was settled."

In People *v.* Matteson (2 *Cow.* 433, note), WALWORTH, Circuit Judge, held: "It is a legal presumption, that every person born and educated in a Christian country, and who has arrived at years of discretion, is a competent witness until the contrary is shown; and in People *v.* McGarren (17 *Wend.* 461) it was held that the objection to the competency of the witness must be taken before he is sworn, although after he has testified, his disbelief may be shown to affect his credibility. Since the constitutional amendment of 1846, all objection to the competency of the witness has been removed, and no testimony will be allowed on that subject. The question of credibility remains, and must remain so long as justice is administered by fallible men. No constitution, no statute could well regulate it. There is no longer a jury of the vicinage. Parties and witnesses are most generally unknown to both courts and juries, especially in the higher courts. When a stranger is offered as a witness on the stand, the judge and jury have a right to know what are his pursuits in life, his associations, and in many cases his

opinions, so that they may the better judge what credibility he is entitled to. It is the duty of the court to see that such inquiries are not too much extended, and to check them where there is a tendency to abuse. Religious opinions, though necessarily of a delicate nature, are not without the pale of inquiry (CAMPBELL, J., in Sanbio *v.* Hopkins, *supra*); but the inquiry, as before remarked, must be limited to prevent abuse.

BALCOM, J., said: "Persons may be competent witnesses and not credible ones;" and upon this ground the court unanimously held that a party against whom an atheist or infidel witness is called, may interrogate him on his cross-examination as to his opinions on matters of religious belief, and show by him that he does not believe in the existence of a God who will punish false swearing, and that it was not erroneous for the judge to charge the jury that the fact thus proved will go to the credit of the witness. Under the constitution of Michigan, act 6, section 34, which declares that "No person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief," the courts of that State decided that this refers only to the competency, and not to the credibility, of a witness. Section 4336, of their compiled laws, goes much farther, and provides that "No person shall be deemed incompetent as a witness in any court, matter or proceeding, on account of his opinions on the subject of religion, nor shall any witness be questioned in relation to his opinions thereon, either before or after he shall be sworn." Under this section the Michigan courts held that it was clearly incompetent to question a witness in reference to his belief in a God, unless it can be shown that belief or disbelief in a God has no reference to "opinions on the subject of religion." Belief, they decide, is a stronger term than opinion, and necessarily includes the latter (see 5 *Mich.* 305). Many of the learned and experienced

men of the present age have been strong in the belief that justice is more securely done in the civil as well as in the criminal courts, by allowing all persons witnessing an ordinary transaction or the commission of a crime to testify on oath or solemn affirmation in any form, considered by them most binding on their consciences, to all they heard, saw, and know about it, leaving the jury as practical men to attach such weight to the testimony offered as its inherent probability merited, and as the age, manner, appearance, social position or good name of the witness required.

*The Albany Law Journal* (vol. 7, p. 6), in an article in regard to the rejection of a French professor from the jury list because of atheistical notions, said, "We protest against the tendency which the case of the French professor has developed, to inquire into the speculative theology, or dogmas, or notions which a proposed witness or juror may hold. For the sake both of religion and law ; for the sake of humanity and of the trust which we repose in our neighbor's honesty, let not these inquiries be pressed too far. The impeachment of the individual sworn by the ordinary processes is a sufficient safeguard against the untruthfulness of testimony. If the deponent or affiant believes in any kind of a God, let him rest there, let him not be driven to the wall. Witnesses and jurymen of undoubted veracity must be rejected often if the courts require a too strict interpretation of the rule that the deponent shall believe in a 'Supreme Being who will punish swearing.'"

*The London Law Times*, in an article upon the same subject, said : "Although to the Christian mind a natural antipathy may present itself as to what belief and credit should be accorded to atheists, it is certain that it is in the interest of justice, and for the benefit of the community, that such persons should be able to give evidence. It is no improbability to sup-.

pose the escape of a murderer from justice because the only person who can supply a necessary, but missing link, chances to be an atheist, and although in the United States, where such evidence has long been receivable, the testimony of an atheist is, as a rule, subject to comments of discredit because he is an atheist, yet it is quite possible for an atheist to speak the truth, and, moreover, to be a person on whom implicit reliance may be placed. Bentham observes that "the rebel to religion may still bear allegiance to the laws of honor, to those laws to which every thinking man, in proportion as he deserves that title, will ever pay obedience." The article closes as follows: "We have no hesitation in expressing our opinion that the magistrate, although actuated, we are sure, by the very best intentions, improperly excluded the evidence of the atheist in the case before him."

The citations from these two well-known law journals show the sentiment both in England and America in favor of receiving the evidence of disbelievers, not for their benefit nor as upholding their doctrines, but to prevent a failure of justice. While all recognize the public sentiment which exists against atheism we must endeavor to prevent popular prejudice from defeating or impairing the effect of the constitutional provision which allows every man to regulate his own conscience and form his own opinions even upon matters of religious belief. Let the law as laid down in the constitution be respected by the bench and the community.

In England, a Parsee, being called as a witness, and refusing to be sworn either upon the Old or New Testament or the Koran, was permitted to bind his conscience by holding openly in his hand a sacred relic, which he was accustomed to carry about his person, and thus taking the oath. The judge at the same time remarked that, strictly speaking, a Parsee should be sworn holding the tail of a cow. Tyler, in his History of Oaths, says that Sir James Macintosh told him that at Bombay he once had a cow brought into court for this purpose. This

would seem a good way to swear a milkman, but a Parsee ought to be sworn upon a grammar. The twelve judges, in Morgan's case, 1 *Leach,* 24, held that a Mohammedan might swear upon the Koran. In Ormichund v. Barker, 1 *Atk.* 21, it was held that a Gentoo might be sworn by touching the foot of one of his priests. In Eutrchman's case, *Our. & M.* 248, it was settled that a broken china saucer is essential to a Chinaman's oath. The Israelite swears upon the Pentateuch or Old Testament, with covered head. The Bedouin grasps the middle tent pole and swears by the life of the tent and its owner. One form of swearing among the Scythians was by the royal hearth. In an interesting paper by Mr. James L. Angle, of Rochester, N. Y., on "The Supernatural in the Administration of Justice," he says: "In his treaty with the king of Sodom, Abraham swore by the uplifted hand (*Gen.* xiv. 22) ; in his treaty with Abimelech he swore by Elohim (*Gen.* xxi. 23) ; and the Hebrews were commanded to swear by the name of Elohim (*Deut.* vi. 13; x. 20). The angel in the Apocalypse is represented as combining the two—the uplifted hand and the name of God (*Rev.* x. 5, 6)—when, standing on sea and land, he swears that time shall be no longer. Jehovah is represented as swearing by himself (*Gen.* xxii. 16; xxvi. 3; *Ex.* vi. 8 ; *Heb.* vi. 13–17) ; as swearing by his own life (*Num.* xix. 28), and by the uplifted hand (*Deut.* xxxii. 40). Jacob swore by the fear of his father, Isaac (*Gen.* xxix. 53), and Joseph by the life of Pharaoh (*Gen.* xi. 11–15)." Erskine once fell in with a witness who insisted on being sworn with the uplifted hand, because the angel in the Apocalypse was thus sworn. "But," said Erskine "you are no angel; and then you don't know he would have been sworn if he had stood on dry land, as you do." We heartily sympathize with Mr. Angle in his observations about "kissing the book." He says: "The custom of kissing the leather covering of the Bible prevails with us; usually the book has been in use for that purpose for many years ; it has passed through thousands of dirty, perhaps filthy, hands, and been pressed to 10,000 lips, many of them redolent with tobacco juice or reeking with other unsavory liquids, some of them bloated, sore and corrupted, by disease and debauchery. I have seen Bibles in use for this purpose whose stained and begrimmed covers looked like fit mediums for contagion, and emblematic of anything but purity and truth; and the osculatory part of our form, while it might make the gorge rise, would certainly have nothing sacred or solemn in its influence. We read that when ' Jacob kissed Rachel he lifted up his voice and wept ' (*Gen.* xxix. 1); why he wept I recollect hearing discussed in my younger years, and the young people of my time could never satisfactorily account for such an effect from such a cause ; but I can understand why the kissing of

some of our court-room Bibles should produce a feeling distorting the features as much as weeping."—*Alb. Law Journal.*

## Deaf and Dumb Witnesses.

The courts formerly held that persons *deaf and dumb* from their birth, were in contemplation of law idiots, but this presumption is no longer recognized, as persons afflicted with these calamities have been found, by the light of modern science, to be much more intelligent in general, and to be susceptible of far higher culture, than was at once supposed. Still, when a deaf mute is adduced as a witness, the court, in the exercise of due caution, will take care to ascertain that he possesses the requisite amount of intelligence and that he understands the nature of an oath. When the judge is satisfied on these heads, the witness may be sworn and give evidence by means of an interpreter. If he is able to communicate his ideas perfectly by writing, he will be required to adopt that, as the more satisfactory method, but if his knowledge of that method is imperfect, he will be permitted to testify by means of signs.

## Children as Witnesses.

With respect to children, no precise age is fixed by law, within which they are absolutely excluded from giving evidence, on the presumption that they have not sufficient understanding. Neither can any precise rule be laid down respecting the degree of intelligence and knowledge which will render a child a competent witness. In all questions of this kind much must ever depend upon the good sense and discretion of the judge. In practice, it is not unusual to receive the testimony of children of *eight* or *nine* years of age, when they appear to possess sufficient understanding.

## Evidence by Convicts.

The Code of Civ. Pro. § 832, provides that "a person, who has been convicted of a crime or misdemeanor is, notwithstanding, a competent witness in a civil or criminal action or special proceeding; but the conviction may be proved, for the purpose of affecting the weight of his testimony, either by the record, or by his cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining him is not concluded by his answers to such a question."